**COURTAULDS NORTH AMERICA, INC., Appellee,**

v.

**NORTH CAROLINA NATIONAL BANK, a National Banking Association, Appellant.**

No. 75–1291.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 8, 1975.

Decided Dec. 30, 1975.

Robert B. Cordle, Charlotte, N. C. (E. Osborne Ayscue, Jr., Helms, Mulliss & Johnston, Charlotte, N. C., on brief), for appellant.

Laurence C. Leafer, Alexandria, Va., on brief for amicus curiae, for First Union Nat. Bank of North Carolina.

Lindsay R. Davis, Jr., Greensboro, N. C. (Welch Jordan, Douglas Arant, Jordan, Wright, Nichols, Caffrey & Hill, Greensboro, N. C., Bradley, Arant, Rose & White, Birmingham, Ala., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and WINTER and RUSSELL, Circuit Judges.

BRYAN, Senior Circuit Judge:

A letter of credit with the date of March 21, 1973 was issued by the North Carolina National Bank at the request of and for the account of its customer, Adastra Knitting Mills, Inc. It made available upon the drafts of Courtaulds North America, Inc. "up to" $135,000.00 (later increased by $135,000.00) at "60 days date" to cover Adastra's purchases of acrylic yarn from Courtaulds. The life of the credit was extended in June to allow the drafts to be "drawn and negotiated on or before August 15, 1973."

Bank refused to honor a draft for $67,346.77 dated August 13, 1973 for yarn sold and delivered to Adastra. Courtaulds brought this action to recover this sum from Bank.[1]

The defendant denied liability chiefly on the assertion that the draft did not agree with the letter's conditions, viz., that the draft be accompanied by a "Commercial invoice in triplicate stating [inter alia] that it covers . . . 100% acrylic yarn"; instead, the accompanying invoices stated that the goods were "Imported Acrylic Yarn."

Upon cross motions for summary judgment on affidavits and a stipulation of facts, the District Court held defendant Bank liable to Courtaulds for the amount of the draft, interest and costs. It concluded that the draft complied with the letter of credit when each invoice is read together with the packing lists stapled to it, for the lists stated on their faces: "Cartons marked: —100% Acrylic." After considering the insistent

---

1. Jurisdiction was pleaded and proved, without question, on diversity of citizenship. Plaintiff Courtaulds is an Alabama corporation with a place of business in Mobile, and defendant Bank is a national banking association located in Greensboro, North Carolina.

rigidity of the law and usage of bank credits and acceptances, we must differ with the District Judge and uphold Bank's position.

The letter of credit prescribed the terms of the drafts as follows:

"Drafts to be dated same as Bills of Lading. Draft(s) to be accompanied by:

1.  Commercial invoice in triplicate stating that it covers 100,000 lbs. 100% Acrylic Yarn, Package Dyed at $1.35 per lb., FOB Buyers Plant, Greensboro, North Carolina Land Duty Paid.

2.  Certificate stating goods will be delivered to buyers plant land duty paid.

3.  Inland Bill of Lading consigned to Adastra Knitting Mills, Inc. evidencing shipment from East Coast Port to Adastra Knitting Mills, Inc., Greensboro, North Carolina."

The shipment (the last) with which this case is concerned was made on or about August 8, 1973. On direction of Courtaulds bills of lading of that date were prepared for the consignment to Adastra from a bonded warehouse by motor carrier. The yarn was packaged in cartons and a packing list referring to its bill of lading accompanied each carton. After the yarn was delivered to the carrier, each bill of lading with the packing list was sent to Courtaulds. There invoices for the sales were made out, and the invoices and packing lists stapled together. At the same time, Courtaulds wrote up the certificate, credit memorandum and draft called for in the letter of credit. The draft was dated August 13, 1973 and drawn on Bank by Courtaulds payable to itself.

All of these documents—the draft, the invoices and the packing lists—were sent by Courtaulds to its correspondent in Mobile for presentation to Bank and collection of the draft which for the purpose had been endorsed to the correspondent.

This was the procedure pursued on each of the prior drafts and always the draft had been honored by Bank save in the present instance. Here the draft, endorsed to Bank, and the other papers were sent to Bank on August 14. Bank received them on Thursday, August 16. Upon processing, Bank found these discrepancies between the drafts with accompanying documents and the letter of credit: (1) that the invoice did not state "100% Acrylic Yarn" but described it as "Imported Acrylic Yarn," and (2) "Draft not drawn as per terms of [letter of credit], Date [August 13] not same as Bill of Lading [August 8] and not drawn 60 days after date" [but 60 days from Bill of Lading date 8/8/73]. Finding of Fact 24. Since decision of this controversy is put on the first discrepancy we do not discuss the others.

On Monday, August 20, Bank called Adastra and asked if it would waive the discrepancies and thus allow Bank to honor the draft. In response, the president of Adastra informed Bank that it could not waive any discrepancies because a trustee in bankruptcy had been appointed for Adastra and Adastra could not do so alone. Upon word of these circumstances, Courtaulds on August 27 sent amended invoices to Bank which were received by Bank on August 27. They referred to the consignment as "100% Acrylic Yarn", and thus would have conformed to the letter of credit had it not expired. On August 29 Bank wired Courtaulds that the draft remained unaccepted because of the expiration of the letter of credit on August 15. Consequently the draft with all the original documents was returned by Bank.

During the life of the letter of credit some drafts had not been of even dates with the bills of lading, and among the large number of invoices transmitted during this period, several did not describe the goods as "100% Acrylic Yarn." As to all of these deficiencies Bank called Adastra for and received approval before paying the drafts. Every draft save the one in suit was accepted.

## Conclusion of Law

The factual outline related is not in dispute, and the issue becomes one of

law. It is well phrased by the District Judge in his "Discussion" in this way:

"The only issue presented by the facts of this case is whether the documents tendered by the beneficiary to the issuer were in conformity with the terms of the letter of credit."

The letter of credit provided:

"Except as otherwise expressly stated herein, this credit is subject to the 'Uniform Customs and Practice for Documentary Credits (1962 revision), the International Chamber of Commerce, Brochure No. 222'." Finding of Fact 6.

Of particular pertinence, with accents added, are these injunctions of the Uniform Customs:

"*Article 7.*—Banks must examine all documents with reasonable care to ascertain that they *appear on their face* to be in accordance with the terms and conditions of the credit.

"*Article 8.*—In documentary credit operations all parties concerned deal in documents and not in goods.

\* \* \* \* \* \*

"If, upon receipt of the documents, the issuing bank considers that they *appear on their face* not to be in accordance with the terms and conditions of the credit, that bank must determine, on the basis of the documents alone, whether to claim that payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit.

\* \* \* \* \* \*

"*Article 9.*—Banks . . . do [not] assume any liability or responsibility *for the description,* . . . quality, . . . of the goods represented thereby . . . .

\* \* \* \* \* \*

"The description of the goods in the commercial *invoice* must correspond with the description in the credit. *In the remaining documents the goods may be described in general terms.*"

■ Also to be looked to are the North Carolina statutes, because in a diversity action, the Federal courts apply the same law as would the courts of the State of adjudication. Here applicable would be the Uniform Commercial Code—Letters of Credit, Chap. 25 G.S. N.C. Especially to be noticed are these sections:

"§ 25–5–109. Issuer's obligation to its customer.—

(1) An issuer's obligation to its customer includes good faith and observance of any general banking usage but unless otherwise agreed does not include liability or responsibility

(a) for performance of the underlying contract for sale or other transaction between the customer and the beneficiary; or

\* \* \* \* \* \*

(c) based on knowledge or lack of knowledge of any usage of any particular trade.

(2) An issuer must examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit but unless otherwise agreed assumes no liability or responsibility for the genuineness, falsification or effect of any document which appears on such examination to be regular on its face."

■ In utilizing the rules of construction embodied in the letter of credit—the Uniform Customs and State statute—one must constantly recall that the drawee bank is not to be embroiled in disputes between the buyer and the seller, the beneficiary of the credit. The drawee is involved only with documents, not with merchandise. Its involvement is altogether separate and apart from the transaction between the buyer and seller; its duties and liability are governed exclusively by the terms of the letter, not the terms of the parties' contract with each other. Moreover, as the predominant authorities unequivocally declare, the beneficiary must meet the terms of the credit—and precisely—if it

is to exact performance of the issuer. Failing such compliance there can be no recovery from the drawee. That is the specific failure of Courtaulds here.

■ Free of ineptness in wording the letter of credit dictated that each invoice express on its face that it covered 100% acrylic yarn. Nothing less is shown to be tolerated in the trade. No substitution and no equivalent, through interpretation or logic, will serve. Harfield, *Bank Credits and Acceptances* (5th Ed. 1974), at p. 73, commends and quotes aptly from an English case: "There is no room for documents which are almost the same, or which will do just as well." *Equitable Trust Co. of N. Y. v. Dawson Partners, Ltd.,* 27 Lloyd's List Law Rpts. 49, 52 (1926). Although no pertinent North Carolina decision has been laid before us, in many cases elsewhere, especially in New York, we find the tenet of Harfield to be unshaken.[2]

■ At trial Courtaulds prevailed on the contention that the invoices in actuality met the specifications of the letter of credit in that the packing lists attached to the invoices disclosed on their faces that the packages contained "cartons marked: — 100% acrylic". On this premise it was urged that the lists were a part of the invoice since they were appended to it, and the invoices should be read as one with the lists, allowing the lists to detail the invoices. But this argument cannot be accepted. In this connection it is well to revert to the distinction made in *Uniform Customs,* supra, between the "invoice" and the "remaining documents", emphasizing that in the latter the description may be in general terms while in the invoice the goods must be described in conformity with the credit letter.

The District Judge's pat statement adeptly puts an end to this contention of Courtaulds:

"In dealing with letters of credit, it is a custom and practice of the banking trade for a bank to only treat a document as an invoice which clearly is marked on its face as 'invoice'". Finding of Fact 46.

This is not a pharisaical or doctrinaire persistence in the principle, but is altogether realistic in the environs of this case; it is plainly the fair and equitable measure. (The defect in description was not superficial but occurred in the statement of the *quality* of the yarn, not a frivolous concern.) The obligation of the drawee bank was graven in the credit. Indeed, there could be no departure from its words. Bank was not expected to scrutinize the collateral papers, such as the packing lists. Nor was it permitted to read into the instrument the contemplation or intention of the seller and buyer. Adherence to this rule was not only legally commanded, but it was factually ordered also, as will immediately appear.

Had Bank deviated from the stipulation of the letter and honored the draft, then at once it might have been confronted with the not improbable risk of the bankruptcy trustee's charge of liability for unwarrantably paying the draft moneys to the seller, Courtaulds, and refusal to reimburse Bank for the outlay. Contrarily, it might face a Courtaulds claim that since it had depended upon Bank's assurance of credit in shipping yarn to Adastra, Bank was responsible for the loss. In this situation Bank cannot be condemned for sticking to the letter of the letter.

■ Nor is this conclusion affected by the amended or substituted invoices which Courtaulds sent to Bank after the

---

**2.** *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 465 (2 Cir. 1970); *Crocker First National Bank v. DeSousa,* 27 F.2d 462 (9 Cir. 1928), cert. denied 278 U.S. 650, 49 S.Ct. 94, 73 L.Ed. 561 (1928), and cases cited; *Lamborn v. Lake Shore Banking and Trust Co.,* 231 N.Y. 616, 132 N.E. 911 (1923); *International Bank-*ing Corp. v. Irving National Bank,* 283 F. 103, 105 (2 Cir. 1922). But see *Banco Espanol de Credito v. State Street Bank & Trust Co.,* 385 F.2d 230, 234 (1 Cir. 1967), cert. denied 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163 (1968).

refusal of the draft. No precedent is cited to justify retroactive amendment of the invoices or extension of the credit beyond the August 15 expiry of the letter.

■ Finally, the trial court found that although in its prior practices Bank had pursued a strict-constructionist attitude, it had nevertheless on occasion honored drafts not within the verbatim terms of the credit letter. But it also found that in each of these instances Bank had first procured the authorization of Adastra to overlook the deficiencies. This truth is verified by the District Court in its Findings of Fact:

"42. It is a standard practice and procedure of the banking industry and trade for a bank to attempt to obtain a waiver of discrepancies from its customer in a letter of credit transaction. This custom and practice was followed by NCNB in connection with the draft and documents received from Courtaulds.

"43. Following this practice, NCNB had checked all previous discrepancies it discovered in Courtaulds' documents with its customer Adastra to see if Adastra would waive those discrepancies noted by NCNB. Except for the transaction in question, Adastra waived all discrepancies noted by NCNB.

"44. It is not normal or customary for NCNB, nor is it the custom and practice in the banking trade, for a bank to notify a beneficiary or the presenter of the documents that there were any deficiencies in the draft or documents if they are waived by the customer."

This endeavor had been fruitless on the last draft because of the inability of Adastra to give its consent. Obviously, the previous acceptances of truant invoices cannot be construed as a waiver in the present incident.

For these reasons, we must vacate the decision of the trial court, despite the evident close reasoning and research of the District Judge, *Courtaulds North*

*America, Inc. v. North Carolina N. B.,* 387 F.Supp. 92 (M.D.N.C.1975). Entry of judgment in favor of the appellant Bank on its summary motion is necessary.

Reversed and remanded for final judgment.