**PRO–FAB, INC., Plaintiff-Appellant,**

v.

**VIPA, INC., and Community Bank, Defendants-Appellees.**

No. 84–8782.

United States Court of Appeals, Eleventh Circuit.

Oct. 3, 1985.

---

Before TJOFLAT and VANCE, Circuit Judges, and ATKINS *, District Judge.

VANCE, Circuit Judge:

Appellant Pro-Fab, Inc., of Rossville, Georgia, sued Vipa, Inc. and Community Bank because the bank, acting on instructions from Vipa, refused to pay on a letter of credit. The district court entered judgment for Pro-Fab and against Vipa under a settlement agreement, but granted the bank's motion for summary judgment against Pro-Fab.[1] Pro-Fab appealed to this court from the adverse summary judgment.

I. *Factual Background*

This story really began when Vipa, Inc., a New York corporation ("Vipa-NY"), successfully bid on an order from the Taiwanese government for the manufacture of track wheels to be used as spare parts for tanks. In February 1982, Angelo Spateri of Vipa-NY negotiated with Charles Carlton, president of Pro-Fab, to have Pro-Fab manufacture metal discs for the track wheels. Pro-Fab was also responsible for shipping the discs to Stalwart Rubber Co. ("Stalwart") where they would be coated with vulcanized rubber. After vulcanization, Pro-Fab was to transport the discs back to its plant for finishing work. Their agreement was confirmed in Pro-Fab's telex quote to Spateri on February 23, 1982. The telex was soon followed by a written purchase order dated March 15, 1982. The contract called for the manufacture of 5,950 track wheels for a total price of $437,325.

Meanwhile, out on the west coast, unbeknownst to Pro-Fab, Spateri consulted with long-time associate Louis Guerriero about the Taiwan deal. Guerriero also happened to be president of Vipa, Inc., but this Vipa was incorporated in California in 1981

Charles J. Gearhiser, Chattanooga, Tenn., for plaintiff-appellant.

Paul T. Carroll, III, Walter J. Matthews, Rome, Ga., Russell F. Wolpert, Los Angeles, Cal., for defendants-appellees.

---

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

1. The other motions and other parties the district court disposed of in its order are not relevant to this appeal.

("Vipa-Cal"). Guerriero insisted at his deposition that the two corporations are completely separate entities. He testified that Spateri was never an officer of Vipa-Cal and had no authority to act for Vipa-Cal. Each sometimes served as a "consultant" to the other, and occasionally they put a deal together. Guerriero explained that Spateri brought him into this deal on a commission basis. Vipa-Cal put up a performance bond for the Taiwanese, and Guerriero took the lead in setting up the financing at his bank, Community Bank, in Burbank, California. Pro-Fab's president, Carlton, testified that he never knew that Vipa-NY and Vipa-Cal were independent entities.

Payment was to be made through a standard back-to-back letter of credit arrangement. The Taiwanese established an irrevocable letter of credit in favor of Vipa-Cal, issued by a Taiwan bank. Vipa-Cal in turn established an irrevocable letter in favor of Pro-Fab, issued by Community Bank. Community Bank played a dual role in the transaction. It was the issuing bank for Pro-Fab and therefore responsible for paying Pro-Fab upon proper demand. It was also an advising bank for Vipa-Cal. It forwarded the necessary documents and advised Vipa-Cal of payments under the letter of credit.

Carlton testified that during the February negotiation, he and Spateri agreed that Pro-Fab would be paid from a letter of credit. Carlton also explained, however, that Spateri agreed to advance Pro-Fab $200,000 from the total contract price under the letter of credit to enable Pro-Fab to buy the steel and the dies, and to cover its other start-up costs. Acting under that assumption, Carlton ordered the steel to make the dies in March, as soon as he received Spateri's purchase order. The promised letter of credit did not arrive until the end of April, however, and contained no provision for the $200,000 advance. The letter of credit was issued by Community Bank and stated it was "for account of Vipa, Inc." at Vipa-Cal's address. Carlton

repeatedly tried to have Spateri change the terms of the letter of credit, but Spateri insisted that they could not be changed. Guerriero claimed that he knew nothing of the promised advance and would never have agreed to pay half of the money up front.

Carlton told Spateri that he had no money to purchase the dies, and he finally received a $26,000 check from Community Bank to cover their cost. Carlton was unsuccessful in borrowing against the letter of credit, and because no other money was forthcoming from Vipa, he mortgaged his home and business to pay his already overdue bill for the steel and to cover other start-up costs.

Sometime around July 1982, Spateri "got hard to find" and Guerriero became directly involved in the deal with Pro-Fab.[2] Guerriero testified that he was concerned about losing his performance bond to the Taiwanese because production was so far behind schedule.

Due to numerous delays for which the manufacturers and Vipa apparently must share blame, the first letter of credit expired October 10, 1982 before a single tank wheel had been shipped. After conferring with Pro-Fab and Stalwart, Guerriero negotiated an extension from the Taiwanese, and Community Bank issued a new letter of credit to Pro-Fab on January 4, 1983. The second letter of credit was intended to cover the initial shipment of at least 2100 wheels, which Guerriero had promised to ship quickly to placate the Taiwanese. Although the amount of the credit was only enough to pay for 2100 wheels, Guerriero agreed to pay for more if Pro-Fab could ship more. The letter of credit was originally due to expire on February 10, 1983, but was later modified to expire April 1, 1983. Carlton testified that the requirements under the second letter of credit were to be the same as those under the first, but the second contained two new provisions: It required oceangoing bills of lading and it prohibited partial shipments.

**2.** In fact, Pro-Fab was unable to locate Spateri to serve process on Vipa-NY for this lawsuit.

Carlton did not protest to the bank when he received the letter of credit, despite the fact that he knew that he would not be able to procure the oceangoing bills of lading.[3]

Pro-Fab made a total of four shipments in the first part of 1983. The first shipment on January 28 contained 2800 wheels. The bank noted that the documents submitted did not conform to the requirements [4] and that payment would cause the letter of credit to be overdrawn. The bank contacted Guerriero, who authorized full payment. The letter of credit was amended to increase the amount and extend the expiration date to April 1, 1983 to cover other shipments.[5] The amendment stated, however, that all other terms of the original credit remained unchanged.

The bank also found defects in the documentation for the next shipment on February 18.[6] Guerriero again waived the discrepancies and Community Bank paid Pro-Fab accordingly. The same pattern was followed for the March 17 shipment.[7] Community Bank sent a written statement along with each check listing the discrepancies in the documents and explaining that Pro-Fab was being paid despite the discrepancies. Controversy arose over the March 10 shipment, the third of four. Carlton had shipped the goods as usual but had heard

nothing from California. When he received the check for the March 17 shipment on March 24, he called Community Bank to inquire about the delay on the March 10 shipment. Only then did the bank inform him that it would not honor the draft because Guerriero refused to waive the nonconformities in the documentation. The bank sent Pro-Fab a list of nine defects in a letter dated March 30, two days before the expiration of the letter of credit.[8] By April 1, Pro-Fab had cured all but three of the listed deficiencies, but the bank continued to refuse payment.

Pro-Fab asks this court to consider essentially three claims against Community Bank. The first is grounded in fraud, and the others are based on the technical requirements of the letter of credit.

## II. Fraud by Community Bank

Although it did not make the precise claim in its complaint, Pro-Fab argues before this court that it proved an act of fraud by Community Bank. Pro-Fab negotiated only with Spateri and contracted with Vipa-NY only through Spateri. At the time the contract was made, Pro-Fab had no knowledge of Guerriero or of Vipa-Cal's existence as a separate entity. At Community Bank's instigation, if not insistence, Guerriero's name was added to the

---

3. Carlton actually received notice of the change earlier. In a letter to Pro-Fab's attorney dated December 20, 1982, Vipa-Cal's attorney emphasized the addition of the term, explaining that Pro-Fab would not be paid until bills of lading were issued.

4. The bank noted the following defects in the documents:
   1. L/C overdrawn
   2. Draft not presented
   3. Mdse. description irregular
   4. Ocean Blading [sic] not presented

5. The amendment also made a minor change in the merchandise description.

6. The bank noted the following defects in the documents:
   1. Merchandise description irregular.
   2. Certificate of conformance shows incorrect number.
   3. Blading [sic] shows incorrect consignee.
   4. Ocean Blading [sic] not presented.

7. The bank noted the following defects in the documents:
   1. Inspection certificate not permitted.
   2. Ocean Blading [sic] not presented.
   3. Partial shipments not permitted.
   4. Draft not presented.
   5. Invoice does not show F.O.B. Pro-Fab Inc.
   6. Truck blading [sic] show [sic] incorrect consignee.

8. In its March 30 letter to Pro-Fab, Community Bank mentioned for the first time that it had contacted Vipa-Cal regarding the discrepancies. The bank listed the following defects:
   1. Draft not endorsed.
   2. Merchandise description irregular.
   3. Copy of truck bill of lading presented.
   4. Duplicate documents presented.
   5. Partial shipments not permitted.
   6. Ocean Bill of Lading not presented.
   7. Inspection Certificate not presented.
   8. Statement "Loaded into containers suitable for ocean shipment" not presented.
   9. Contract # TK1006W030PE not shown.

contract as president of Vipa, Inc. Barbara Gregory, the bank vice-president who handled the issuance of the letter of credit, explained that she did not know Spateri to be president of Vipa and would not accept the document with his signature. She admitted that when Spateri sent her the "new last pages" of the contract, she did not inform Pro-Fab of the change or attempt to discover if Pro-Fab knew of the change.

This court has recently summarized the elements of a fraud action in Georgia:

> Under Georgia law, the elements of a cause of action for fraud are (1) a false representation made by the defendant; (2) scienter, or knowledge of the statement's falsity at the time the statement was made; (3) an intention to induce the plaintiff to act or refrain from acting in reliance on the statement; (4) the plaintiff's justifiable reliance; and (5) damage to the plaintiff.

*Wolfe v. Chrysler Corp.*, 734 F.2d 701, 703 (11th Cir.1984) (citation omitted). Certainly we cannot condone the irresponsible, deceitful conduct that Pro-Fab's evidence discloses, yet we must agree with the district court that Pro-Fab has shown no damage caused by the addition of Vipa-Cal to the contract. Pro-Fab claims it was damaged by Vipa-Cal's repudiation of the promise of $200,000 advance money, but Pro-Fab was still dealing directly with Spateri when the first letter of credit arrived, and he offered no help in getting the advance. Pro-Fab also contends that if Carlton had known of the two Vipa's, he might not have gone so deeply in debt to finance the project, but such an allegation is simply too speculative to prove a damage claim. Pro-Fab would have been stuck with steel and discs and nothing to do with them when Spateri disappeared in the summer of 1982, but Guerriero got the extension for delivery and kept the deal going. This is not to say that Guerriero's conduct was exemplary—the record convincingly reveals a contrary story. We simply point out that discovering an instance of misconduct, even an egregious one such as this, is not sufficient to establish Community Bank's liability. Pro-Fab has not demonstrated that the bank's silence placed it in a worse position. The additional signature made an additional party liable to Pro-Fab—indeed, the only Vipa that Pro-Fab could sue.

### III. *Withholding Payment on the Letter of Credit*

Pro-Fab contends that Community Bank cannot hide behind the discrepancies in the documents Pro-Fab presented to refuse payment for the March 10 shipment. Pro-Fab first argues that the district court erred in refusing to apply the equitable doctrines of waiver and estoppel. Pro-Fab points out that the bank had paid for two shipments before March 10 and one shipment after, despite the fact that it presented nonconforming documents each time. According to Pro-Fab, Community Bank cannot now assert the defects as a basis for dishonor.

Although letters of credit are subject to the statutory provisions in Article 5 of the Uniform Commercial Code, Ga.Code Ann. §§ 11–5–101 to –117, the predecessor to this court has recognized that equitable doctrines such as waiver and estoppel apply to these types of transactions. *Barclays Bank D.C.O. v. Mercantile National Bank*, 481 F.2d 1224, 1236–37 (5th Cir. 1973), *cert. dismissed*, 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974). In *Barclays Bank*, Mercantile Bank notified Barclays that it would not honor its demand for payment because the issuer of the letter of credit refused to pay, although Mercantile stated that all of the required documentation had been submitted with the draft. When Barclays sued, Mercantile claimed for the first time that it was not required to pay because Barclays had not submitted proper documents. *Id.* at 1236. The fifth circuit held that Mercantile had waived the defects by failing to object to them in its letter and to give Barclays an opportunity to cure. *Id.* Other cases that have used waiver and estoppel principles against dishonoring banks have arisen under similar circumstances, where banks have given presenters of nonconforming

documents no hint of the noncompliance. *See, e.g., Chase Manhattan Bank v. Equibank,* 550 F.2d 882, 885–87 (3d Cir.1977) (if bank authorized a delayed presentation of documents, it cannot refuse payment because of expiration of letter of credit); *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 466 (2d Cir.1970) (bank that paid for shipment of goods would be estopped from later claiming it did not have to pay additional charges included under the letter of credit because the shipment was only partial); *Schweibish v. Pontchartrain State Bank,* 389 So.2d 731, 737–38 (La.Ct.App.1980) (where bank did not require strict compliance with terms of prior letters of credit to same beneficiary, it could not assume totally inconsistent position by insisting on strict compliance for subsequent letter of credit).

■ Community Bank's acts do not fall into this category. It is clear that in this case Community Bank did not waive any of the discrepancies by paying for the other shipments. If it had made any independent modification of the terms of the credit, it risked losing its right of reimbursement from Vipa-Cal. *See* Ga.Code Ann. § 11–5–106(2). The bank did not pay until it had received authorization from Vipa-Cal, and it notified Pro-Fab with each check that payment was being made despite the specifically listed discrepancies. This is not a case in which the bank misled the presenter to its detriment. Pro-Fab was fully aware of the defects before it shipped. Without Vipa-Cal's waiver the bank properly refused payment. *See Courtaulds North America, Inc. v. North Carolina National Bank,* 528 F.2d 802, 807 (4th Cir.1975).

■ Pro-Fab also argues that the court should have ordered the bank to pay because it "substantially complied" with the terms of the letter of credit. The argument is based on *First National Bank v. Wynne,* 149 Ga.App. 811, 256 S.E.2d 383

(1979), which held that "if from all the documents presented to the issuer by the beneficiary there is substantial compliance with the terms of the letter of credit *and* there is no possibility that the documents submitted could mislead the issuer to its detriment, there has been compliance with the letter of credit." 256 S.E.2d at 386–87. Pro-Fab contends that it cured all but three of the deficiencies as soon as the bank notified it on March 30. The remaining three deficiencies were: a prohibited partial shipment, no oceangoing bills of lading, and no inspection certificates. The bank had possession of the bills of lading and the inspection certificates according to Pro-Fab, because the bank was responsible for forwarding Vipa-Cal's documentation to permit Vipa-Cal to be paid from the Taiwanese letter of credit. Pro-Fab therefore claims that the bank actually had all the necessary documents, either from Pro-Fab or another source. The prohibition against partial shipments should be irrelevant, in Pro-Fab's view, because it was obvious to all parties that there would be more than one shipment. Guerriero would have had no reason to ask the bank for an extension on the letter of credit if the only contemplated shipment was the first one on January 28.[9]

Despite Pro-Fab's contentions, however, we agree with the district court that these circumstances are well beyond the *Wynne* court's minor departure from the rule of strict compliance. Our decision is based on the peculiar strictures of the letter of credit transaction. The letter of credit contract between Vipa-Cal, the customer, and Community Bank, the issuing bank, is completely separate from the underlying contract between Pro-Fab and Vipa-Cal. The bank's duties to the beneficiary, Pro-Fab, are likewise distinct from the other contracts. The bank is obligated to look only to the requirements of the letter of credit, not to

---

**9.** We believe the bank would be estopped to assert the partial shipment as a defect since it was not listed on the notice of discrepancies for either of the first two shipments. *See Barclays Bank D.C.O. v. Mercantile National Bank,* 481 F.2d 1224, 1236 (5th Cir.1973) (when refusal to pay is specifically based on one ground, bank is held to have waived all others), *cert. dismissed,* 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974). This is irrelevant to the outcome, however, because of our analysis of the other defects.

any other activity between the parties. *See* Ga.Code Ann. §§ 11–5–109 to –114.[10] *See also Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 235 (5th Cir.1983); *Courtaulds,* 528 F.2d at 805–06. The beneficiary must strictly conform to the requirements of the letter of credit, because the bank is bound to adhere to them and not look beyond the face of the documents presented. If the beneficiary does not comply, the bank is not required to pay. *See Philadelphia Gear,* 717 F.2d at 235–36; *Courtaulds,* 528 F.2d at 805–06; *Venizelos,* 425 F.2d at 465.

Some courts, like the Georgia appellate court in *Wynne,* have allowed a small measure of flexibility in the general rule of strict compliance by looking at the documents submitted as a whole instead of passing on each piece of paper in isolation.

If the documents taken together satisfy the letter of credit, the bank should pay. These cases, however, concern only small discrepancies. In *Wynne,* for example, the letter of credit required the beneficiary to submit a signed notice of default that referred to the letter of credit by number and a draft that referred to the letter of credit by number. The beneficiary submitted the letter of credit itself, a fully conforming notice of default, and a draft that was correct except for the omission of the letter of credit number. The bank refused to pay because the number was missing from the draft. The Georgia appellate court held that the submitted letter of credit and notice of default sufficiently tied the demand for payment to the particular letter of credit and the omission from the accompanying draft was not a material variance. *Wynne,* 256 S.E.2d at 384–86. *See also Flagship*

---

**10.** Section 11–5–109 reads in relevant part:

**11–5–109. Issuer's obligation to its customer.**

(1) An issuer's obligation to its customer includes good faith and observance of any general banking usage *but unless otherwise agreed* does not include liability or responsibility:

   (a) For performance of the underlying contract for sale or other transaction between the *customer and the beneficiary; or*

   (b) For any act or omission of any person other than itself or its own branch or for loss or destruction of a draft, demand, or document in transit or in the possession of others; or

   (c) Based on knowledge or lack of knowledge of any usage of any particular trade.

(2) An issuer must examine documents with care so as to ascertain that on their face they appear to comply with the terms of the credit but unless otherwise agreed assumes no liability or responsibility for the genuineness, falsification, or effect of any document which appears on such examination to be regular on its face.

Ga.Code Ann. § 11–5–109 (1982).

Section 11–5–114 reads in relevant part:

**11–5–114. Issuer's duty and privilege to honor; right to reimbursement.**

(1) An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary. The issuer *is not excused from honor of such a* draft or demand by reason of an additional

general term that all documents must be satisfactory to the issuer, but an issuer may require that specified documents must be satisfactory to it.

(2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title (Code Section 11–7–507) or of a security (Code Section 11–8–306) or is forged or fraudulent or there is fraud in the transaction:

   (a) The issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course (Code Section 11–3–302) and in an appropriate case would make it a person to whom a document of title has been duly negotiated (Code Section 11–7–502) or a bona fide purchaser of a security (Code Section 11–8–302); and

   (b) In all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery, or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

(3) Unless otherwise agreed an issuer which has duly honored a draft or demand for payment is entitled to immediate reimbursement of any payment made under the credit and to be put in effectively available funds not later than the day before maturity of any acceptance made under the credit.

Ga.Code Ann. § 11–5–114 (1982).

*Cruises, Ltd. v. New England Merchants National Bank,* 569 F.2d 699 (1st Cir.1978) (payment is proper where documents, if taken as a whole, offer *no* possibility of misleading issuer); *Banco Espanol de Credito v. State Street Bank and Trust Co.,* 385 F.2d 230 (1st Cir.1967), *cert. denied,* 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163 (1968) (variance in inspection certificates, largely created by conflicting instructions from customer, too insignificant to justify dishonor).

Pro-Fab's documentation did not simply contain a few clerical errors. Two documents were omitted, including the ocean bill of lading, which is the only evidence that the wheels actually went to Taiwan. The fact that the bill of lading and inspection certificate passed through another department of Community Bank [11] on the way to Taiwan does not satisfy Pro-Fab's presentment duty. Community Bank is not required, indeed is not permitted to look beyond the documents submitted by Pro-Fab. *See, e.g., Marino Industries v. Chase Manhattan Bank,* 686 F.2d 112, 119 (2d Cir.1982). Our research has revealed no case in any jurisdiction that has found substantial compliance by a beneficiary that failed, as Pro-Fab did, to present all the documents called for in the letter of credit.

### IV. *Wrongful Dishonor Under Section 11–5–112*

Pro-Fab's final argument, not treated in the district court's opinion, presents a genuine issue of material fact that precludes summary judgment. *Sweat v. Miller*

*Brewing Co.,* 708 F.2d 655 (11th Cir.1983). Pro-Fab contends that Community Bank was guilty of wrongful dishonor under section 11–5–112 of the Georgia Code because it failed to give notice of dishonor within the required time period.[12] Community Bank does not concede that it failed to give timely notice, but argues that notice was irrelevant because Pro-Fab admits that it could never have produced the two missing documents no matter how much time it was given. The bank further contends that Pro-Fab breached its presentment warranty under section 11–5–111. Because Pro-Fab knowingly presented nonconforming documentation, the bank claims it was absolved of its duty to honor the draft or to give timely notice of dishonor.

The sophistry of Community Bank's first response is apparent. The bank's duty to notify is in no way contingent upon its evaluation of the usefulness of the notice. The fact that Community Bank has now realized in hindsight that Pro-Fab did not have direct access to the required documents because they were passing through another department of the bank would not excuse a failure to give timely notice in March 1983.

The argument that Pro-Fab's breach of the presentment warranty removed any necessity for the bank to act is a more difficult question. Under the plain language of section 11–5–112, the bank's duty appears absolute. On the other hand, it seems illogical to impose strict liability on the bank for failure to notify a beneficiary that

---

**11.** Pro-Fab's demands on the letter of credit were handled by Raymond Peters, an import negotiator at Community Bank. Vipa-Cal's demands on the Taiwanese letter of credit were handled by export negotiator Joyce Somers. Each testified that their departments were completely independent, and both said they had no knowledge of the other's work for Vipa-Cal.

**12. 11–5–112. Time allowed for honor or rejection; withholding honor or rejection by consent; "presenter."**

(1) A bank to which a documentary draft or demand for payment is presented under a credit may without dishonor of the draft, demand, or credit:

(a) Defer honor until the close of the third banking day following receipt of the documents; and

(b) Further defer honor if the presenter has expressly or impliedly consented thereto. Failure to honor within the time here specified constitutes dishonor of the draft or demand and of the credit except as otherwise provided in subsection (4) of Code Section 11–5–114 on conditional payment.

(2) Upon dishonor the bank may unless otherwise instructed fulfill its duty to return the draft or demand and the documents by holding them at the disposal of the presenter and sending him an advice to that effect.
Ga.Code Ann. § 11–5–112 (1982).

would not be entitled to payment anyway. The fifth circuit recently considered a similar problem in *Philadelphia Gear Corp. v. Central Bank*, 717 F.2d 230 (5th Cir.1983). The court there explained that under its contract with its customer, the issuing bank promises to hold itself ready for the duration of the letter of credit to pay the beneficiary whenever the beneficiary makes a demand for payment in compliance with the terms of the letter of credit. The issuing bank's duties begin only when a proper presentment is made. Thus, the first focus of the inquiry must be the adequacy of the beneficiary's performance. *Id.* at 236–38. The court concluded that when a beneficiary knowingly tendered nonconforming drafts, the beneficiary could not later recover on the ground that it received inadequate notice from the issuing bank. *Id.* at 238. The court observed, "[i]t would be a strange rule indeed under which a party could tender drafts containing defects of which it knew and yet attain recovery on the ground that it was not advised of them." *Id.*

■ We agree with the fifth circuit's conclusion, but recognize that the facts of our case require us to extend the inquiry. In *Philadelphia Gear*, there was no question that the issuing bank had given timely notice of the deficiencies. The issue rather was whether the bank's explanation of the defects was sufficient. *Id.* at 236. In this case, there remains a question of fact whether Pro-Fab "knowingly" presented nonconforming documents. The fact that Community Bank had access to the missing documents and had paid for two previous shipments with nonconforming documents, although not sufficient to constitute a waiver of the nonconformities, would certainly raise a reasonable inference that Pro-Fab thought it was submitting enough to get paid. In that sense, Pro-Fab might not have had the requisite prior knowledge that its third presentment was fatally flawed. Thus the first question of fact is

whether the documentation for the other shipments was so similar to that for the third shipment that Pro-Fab could reasonably have expected it to be acceptable.[13] If Pro-Fab lacked the requisite knowledge, Community Bank was not relieved of its obligation to notify Pro-Fab of the dishonor in timely fashion under section 11–5–112. Two fact questions remain, however, in applying that section to this case. First, nothing in the record indicates when Community Bank actually received the documents from Pro-Fab. This court therefore cannot evaluate the timeliness of the bank's notice. The second fact question is whether the dealings among the parties indicate that Pro-Fab expressly or impliedly consented to Community Bank's delay. *See* Ga.Code Ann. § 11–5–112(1)(b).

## V.  *Conclusion*

We find no error in the district court's disposition of Pro-Fab's waiver, estoppel, and substantial compliance claims. We are not convinced, however, that the bank can escape liability under the technical requirements of the Georgia Commercial Code that it has so forcibly thrust upon Pro-Fab. We therefore remand this case to the district court for further proceedings to determine the necessity and adequacy of Community Bank's notice.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

---

13. It is not clear from the record exactly what Pro-Fab submitted with each shipment. The included exhibits appear to contain only Vipa-Cal's documents for the Taiwanese letter of credit.