**OCCIDENTAL FIRE & CASUALTY COMPANY OF NORTH CAROLINA, Plaintiff,**

v.

**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant.**

No. 88 C 6264.

United States District Court, N.D. Illinois.

June 23, 1989.

Marvin Glassman, Rabens, Formusa & Glassman, Ltd., Chicago, Ill., and Peter M. Foley, Leboeuf, Lamb, Leiby & Macrae, Raleigh, N.C., for plaintiff.

Francis J. Higgins and James L. Meador, Bell, Boyd & Lloyd, Chicago, Ill., for defendant.

BRIAN BARNETT DUFF, District Judge.

Judge John M. Cannella once wrote, with some authority, that letter of credit liability cases were "particularly appropriate for judicial resolution without trial because they present solely legal issues." *Bank of Cochin Ltd. v. Manufacturers Hanover Trust*, 612 F.Supp. 1533, 1537 (S.D.N.Y. 1985). For every rule there is an exception, however, and the parties to the letter of credit case before this court have found it—despite submitting cross-motions for summary judgment. Their work will narrow this dispute, but its ultimate disposition will depend on the outcome of a trial.

The parties do not dispute the following facts. In 1984, Bill's Coal Company, Inc. was engaged in mining operations in Kansas. To comply with a request of the State of Kansas, Bill's Coal needed to obtain bonds to insure its obligation to reclaim its mining sites. Bill's Coal first sought the bonds from Union Indemnity Insurance Company of New York. Union Indemnity was not licensed as an insurer in Kansas, so Union Indemnity asked Occidental Fire & Casualty Company of North Carolina to issue the bonds instead. Union Indemnity promised Occidental Fire to reinsure these bonds 100%.

Occidental Fire agreed to Union Indemnity's request, and issued 29 reclamation bonds in an aggregate penal amount of $4,239,816. One condition was that Bill's Coal obtain certain irrevocable letters of credit running in favor of Occidental Fire and Union Indemnity. Bill's Coal went to its banker, Continental Illinois National Bank and Trust Company of Chicago, and applied for seven such letters, which had an aggregate face value of $2,069,000. Bill's Coal requested that the "beneficiary" of each letter of credit be "Union Indemnity Ins. Co. of N.Y. and Occidental Fire & Casualty Co. of North Carolina as their respective interests may appear." Continental Illinois complied with Bill's Coal's instructions. Additionally, Bill's Coal required those seeking to draw under each letter of credit to certify to Continental Illinois that

—You, as surety have executed or have procured the execution of bond(s) or undertaking(s) at the request of Bill's Coal Company, Inc., and that you have incurred liability in an amount not less than the amount of the accompanying sight draft(s), or that as of the close of business in Chicago on the day which is ten (10) days prior to the expiry date of this Letter of Credit you have received neither an amendment renewing this Letter of Credit for an additional year nor an acceptable replacement thereof.

—Any funds drawn under the Letter of Credit shall be held apart by you for the purpose of reimbursing any incurred liabilities of the aforementioned bond(s) or undertaking(s).

—Should funds drawn not be used by you for the satisfaction of or reimbursement of any loss, cost, claim for expenses of any nature whatsoever, incurred by you, (including unpaid premiums) on any such bond(s) or undertaking(s) as aforesaid, such amounts shall be returned directly to [Continental Bank]....

A few months after issuing the letters of credit, Continental Illinois reduced the face

amount of letter No. 6328290 from $1,014,-000 to $733,000. It is disputed whether Occidental Fire consented to this reduction; as will be seen shortly, this matter will require a trial. Nevertheless, the letters originally were to expire March 31, 1985. The parties later extended them to March 31, 1986.

1985 was a bad year for two of the players in this story. Effective August 15, 1985, Union Indemnity went into liquidation. The Superintendent of Insurance of the State of New York became the Liquidator of the company. Four months later Bill's Coal went into bankruptcy, which meant that it would not reclaim its mining sites. The State of Kansas thus approached Occidental Fire the following spring and demanded that Occidental either honor its obligations under its surety bonds or else arrange for someone to reclaim the mining sites at Occidental Fire's expense. In September 1986 Occidental Fire agreed to forfeit $449,718 in bonds to the State and have a contractor perform reclamation work valued at $2,008,820.

Occidental Fire and the Liquidator of Union Indemnity meanwhile sought to reduce their liability. In the Spring of 1986, the two presented Continental Illinois with sight drafts for payment under the letters of credit. Continental Illinois dishonored the drafts, but extended the expiration date of the letters to March 31, 1987. Occidental Fire submitted a new draft on its own in December 1986, which Continental Illinois rebuffed on the grounds that Union Indemnity had not joined in certifying it. Occidental Fire made another unilateral draw on February 6, 1987. Continental Illinois dishonored it on February 11, 1987, telling Occidental Fire again that it was not joined by union Indemnity. Unbeknownst to Continental Illinois, Occidental Fire was facing objections for these unilateral draws from the Liquidator, who was demanding that Occidental Fire deliver the letters of credit or else face suit.

On March 25, 1987, Occidental Fire and Liquidator delivered joint drafts to Continental Illinois, seeking to draw on the letters. In the certificate accompanying each draft, Occidental Fire and the Liquidator stated in part:

We hereby certify that we, as sureties have executed or have procured the execution of bond(s) or undertaking(s) at the request of Bill's Coal Company, Inc. and that we have incurred liability in an amount not less than the amount of the accompanying sight drafts. Further, any funds drawn under this letter of credit shall be held apart by us for the express purpose of reimbursing any incurred liabilities for any bond(s) or undertaking(s).

Should funds drawn not be used by use for the satisfaction of or reimbursement of any loss, cost, claim for expense of any nature whatsoever incurred by us, (including unpaid premiums), on any bond(s) or undertaking(s), such amounts shall be returned directly to Continental Illinois....

Occidental Fire and the Liquidator asked Continental Illinois to remit amounts payable under the letters of credit to the "Superintendent of Insurance of the State of New York as Liquidator ... and Occidental Fire & Casualty Co. of North Carolina as their respective interests may appear."

March 25 was a Wednesday. On Friday, March 27, after 4:00 p.m. Central Standard Time ("CST"), Continental Illinois decided that it would dishonor the March 25 drafts. Continental Illinois' attorney, Robert V. Shannon, prepared a letter stating that the draws were "non-conforming," and that Occidental Fire and the Liquidator would be receiving notice of dishonor and the reasons for the dishonor "by not later than Monday morning." Shannon also listed five "concerns" which Shannon wrote "may affect Continental Illinois' response to any future draws and may be the basis for dishonor of any future draw." Shannon sent this letter to Peter M. Foley, counsel for Occidental Fire, who received it on Monday, March 30.

The same morning that Foley received Continental Illinois' March 27 letter, a Continental Illinois employee named Samuel Perez phoned Occidental Fire. The content of Mr. Perez's message is disputed, but at a minimum he told Occidental that Continental Illinois was dishonoring the March

25 drafts. Later on March 30 attorney Shannon spoke directly with attorney Foley about Continental Illinois' March 27 letter. Dishonor was the subject of this conversation too, but whether it was formal notice of dishonor, and the reasons for dishonor, is disputed.[1] What is undisputed is that later on March 30 Continental Illinois prepared a written notice of dishonor and the reasons for its action, which Continental Illinois delivered to Occidental Fire and the Liquidator via express mail on March 31, 1987. At 5:00 p.m. CST that same day the letters of credit expired, without. Occidental Fire and the Liquidator having attempted to make another draw.

Occidental Fire brought a three-count complaint to this court on July 21, 1988. In Count 1, Occidental Fire charges that Continental Illinois' "unilateral" amendment of letter of credit No. 6328190 constituted an anticipatory repudiation of this letter. In Count 2, Occidental Fire claims that Continental Illinois' February 6, 1987 dishonor was wrongful, while in Count 3 Occidental Fire claims that Continental Illinois' dishonors of February 6 and March 25, 1987 were wrongful. The Liquidator has dropped from the picture, partly as a result of assigning all of its right, title and interest in the disputed letters of credit to Occidental Fire.

The parties have filed cross-motions for summary judgment on all of the issues which separate them. As this court sits in Illinois, it must look to Illinois law to decide which law governs this dispute. See *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 495–96, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In cases involving contracts—and a letter of credit is a contractual instrument—the Illinois courts generally will apply the law chosen by the parties, when the parties' contract indicates a choice of law. See *Hofeld v. Nationwide Life Ins. Co.*, 59 Ill.2d 522, 529, 322 N.E.2d 454, 458 (1975). Each letter of credit states that Illinois law governs, and that it is further subject to the Interactional Chamber of Commerce's

Uniform Customs and Practice for Documentary Credits (Rev. ed.1974) (hereafter "UCP").

The first issue is whether Continental Illinois wrongfully dishonored Occidental Fire's unilateral draft of February 6, 1987, for failing to get the joint certification of the Liquidator. The letters of credit in this action are subject to Illinois' version of the Uniform Commercial Code (11 ucc 11)—Letters of Credit, codified at Ill.Rev.Stat. ch. 26 ¶¶ 5–101 et seq. (1979). According to § 5–114(2)(a), a letter of credit issuer (here, Continental Illinois) "must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer"—in this case, Bill's Coal—"and the beneficiary"—in this case, a disputed term. Section 5–114 states further that the issuer "is not excused from honor ... by reason of an additional general term that all documents must be satisfactory to the issuer, but an issuer may require that specified documents must be satisfactory to it." The UCP elaborates further that "[i]n documentary credit operations all parties concerned deal in documents and not in goods." UCP art. 8(a).

 The core of the parties' dispute over the February 6 dishonor is whether the letters of credit required joint certification. Continental Illinois initially asks this court to reason from the law governing commercial paper, which states that "[a]n instrument payable to the order of two or more persons ... if not in the alternative is payable to all of them and may be negotiated, discharged or enforced only by all of them." Ill.Rev.Stat. ch. 26 ¶ 3–116(b). This court will not apply the joint payee presumption of the UCC's commercial paper rules to transactions involving letters of credit so unhesitatingly. Article 3's rules expressly apply only to negotiable instruments, see id. at ¶ 3–102(1)(e) (defin-

---

**1.** Occidental Fire contends that Continental Illinois never argues this. While Continental Illinois' Local Rule 12(E) Statement, ¶ 23 could give one the impression that Continental Illinois

does not argue that Shannon gave notice, Continental Illinois' briefs are to the contrary. See Memorandum in Support of the Renewed Motion of Defendant, 13–14.

ing "instrument" under Article 3 as "negotiable instrument"), and Article 5 does not incorporate Article 3 in its entirety, see id. at ¶ 5–103 (definitions of Article 5)—This suggests to the court that the Illinois legislature did not intend to apply Article 3's joint payee presumption to Article 5 transactions.

 The answer to the issue posed by the parties lies within the letters of credit themselves, and to define the answer the court will employ the principles of law generally applied to interpret contracts in Illinois. See *Bank of North Carolina, N.A. v. Rock Island Bank*, 570 F.2d 202, 207 (7th Cir.1978) (applying Illinois law—contract principles govern construction of letters of credit, absent contrary provisions in UCC). Whether a party is jointly obligated under a contract "depends on the intention of the parties as expressed by the language of the document and the circumstances surrounding the parties at the time of its execution." *Smith v. Clark Equipment Co.*, 136 Ill.App.3d 800, 803–04, 91 Ill.Dec. 520, 523, 483 N.E.2d 1006, 1009 (1985). If the agreement is indefinite, the court "will look to and adopt an interpretation which the parties themselves have placed on it. Evidence of such an interpretation may be seen in the parties' contemporaneous or subsequent acts or conduct. In determining whether a certain relationship exists between the parties, the court must look to the substance rather than the form of the transaction, and the categorization given to a relationship by the interested parties is not conclusive of the nature of the relationship." *Hodgman, Inc. v. Feld*, 113 Ill. App.3d 423, 428–29, 69 Ill.Dec. 233, 237, 447 N.E.2d 450, 454 (1983) (citations omitted).

 Neither party argues that the letters of credit here were ambiguous—rather, they differ only as to how the letters should be interpreted. Several facts lead this court to conclude that Occidental Fire and Union Indemnity were joint beneficiaries of the letters of credit. First, each letter lists the companies under the singular heading "Beneficiary." The parties did not employ the heading "Beneficiaries."

Second, the letters employ the noun "you" throughout, and they never refer to the companies separately. The only suggestions of a distinction between the companies appear in the listing of the companies as beneficiary—in the language "as their respective interests may appear"—and in the first sentence of the required certification, when the beneficiary was to certify that "[y]ou, as surety have executed or have procured the execution of bond(s) or undertaking(s)...." The former language found its way into the letters of credit at the request of Continental Illinois' customer, Bill's Coal. Looking at the document and the circumstances as a whole, this court agrees with Continental Illinois' argument that, at best, this language reflected Bill's Coal's recognition that after a draw, Occidental Fire and Union Indemnity were free to divide the proceeds of the letters as they wished. This language does not overwhelm the singular language "beneficiary" or the plural "you" used throughout the contract.

The language referring to a "surety" and a procurer of the bonds similarly reflects the need for a joint draw. Had the parties intended for "you, as surety having executed the bond(s) or undertaking(s)" or "you, having procured the execution of bond(s) or undertaking(s)" to be able to draw on the letters, separately and independently of the other beneficiary-party, the parties could have placed the alternative certifications in parentheses, or set off the alternative descriptions of "you" using commas. Instead, "you" is described by a unitary phrase, which, suggests that "you" retains its plural sense throughout the certificate.

The conduct of the parties reinforces the court's view that this is the proper construction of the letters. Occidental Fire and Union Indemnity or the Liquidator attempted joint draws. on the letters of credit in both spring 1986 and March 1987. When the Liquidator learned of Occidental Fire's unilateral attempts in December 1986 and February 1987 to draw on the letters, the Liquidator protested to Occidental Fire, as the Liquidator believed that it was a "co-

beneficiary" with Occidental Fire on the letters. Occidental Fire's attorney acknowledged to the Liquidator in a letter dated July 24, 1986 that the letters were issued "jointly"; in January 1987 this attorney wrote that the Liquidator's "acquiescence" in draws under the letters was "important."

While Occidental Fire rightly points out that Continental Illinois could not have relied on Occidental Fire's dispute with the Liquidator in dishonoring Occidental Fire's draw—as noted earlier, banks must deal in documents only—under Illinois law this court can rely on the parties' actions in construing a contract. See *Smith*, 136 Ill. App.3d at 803–04, 91 Ill.Dec. 520, 483 N.E.2d 1006; *Hodgman*, 113 Ill.App.3d at 428, 69 Ill.Dec. 233, 447 N.E.2d 450. The parties' conduct confirms that Continental Illinois' interpretation of the letters was correct: the letters made Occidental Fire and Union Indemnity joint beneficiaries. Continental Illinois thus did not act wrongfully in dishonoring Occidental Fire's unilateral draw of February 6, 1987.

■ The court now turns to consider whether Continental Illinois wrongfully dishonored Occidental Fire and the Liquidator's joint draw of March 25, 1987. Occidental Fire first contests the reason given by Continental Illinois for its dishonor: rather than certifying that funds drawn under the letters of credit would be held apart for payment of liabilities on the "aforementioned bond(s) or undertaking(s)," the company and the Liquidator certified that they would hold funds for the payment of liabilities on "any bond(s) or undertaking(s)." Similarly, rather than certifying that they would remit sums not used for satisfying liabilities "on any such bond(s) or undertaking(s) as aforesaid," the company and the Liquidator promised that they would remit sums not used to satisfy liabilities "on any bond(s) or undertaking(s)...."

Occidental Fire admits, as it must, that the language of the March 25 certificates differs from that spelled out in the letters of credit themselves. Occidental Fire suggests that some of the confusion may stem from an unintentional omission of the word "such" from its certificates, which would have related the references to "bond(s) or undertaking(s)" more directly to the earlier statement in the certificates that Occidental Fire and Union Indemnity had issued bonds on behalf of Bill's Coal. Occidental Fire itself insists elsewhere, however, that Continental Illinois could not speculate as to the underlying facts or transactions that resulted in draws under the letters of credit. Had Continental Illinois amazingly leapt to the conclusion upon reading the March 25 drafts that the parties had really meant "any such bond(s) or undertaking(s)" rather than "any bond(s) or undertaking(s)," it would have violated this principle. It would have been as if Continental Illinois had inferred that the parties unintentionally omitted the words "Kentucky" or "red" or "Euroyen," then paid on that basis.

Occidental Fire's stronger argument is that its certificates substantially complied with the terms set forth in the letters of credit. Despite the language of the UCC and the UCP requiring an issuer to honor a draft only when it complies with the terms of the relevant credit, see Ill.Rev.Stat. ch. 26, ¶ 5–114(2)(a); UCP, art. 3(a), some Illinois courts have held that compliance need not be exact. In *First Arlington Nat'l Bank v. Stathis*, 90 Ill.App.3d 802, 46 Ill. Dec. 175, 413 N.E.2d 1288 (1980), Gus Stathis was a beneficiary of a letter of credit issued by First Arlington. The letter guaranteed payment of $575,000 upon presentation of an endorsed $575,000 promissory note, the documents securing the note, and a certificate stating among other things that the promissors had not complied with Stathis's demand for payment. In 1974 Stathis sought payment, presenting everything required under the letters with one difference: rather than stating that he had made a demand and was accelerating, his documents suggested that acceleration was yet to come. Id. at 814, 46 Ill.Dec. 175, 413 N.E.2d 1288.

Despite this difference, the Stathis court held that Stathis had "reasonably complied" with the terms of the credit. Stath-

is's demand letters had only warned of acceleration, but Stathis's affidavits recounted that the promissors had ignored these warnings. The court determined that Stathis's documents presented an "effective notice" of acceleration, and thereby met the terms of the credit. Id. at 815–16, 46 Ill.Dec. 175, 413 N.E.2d 1288.

Stathis's standard of reasonable compliance in presentation of draft documents found favor with some courts in this district in the years following its publication. See, for example, *Crocker Commercial Services v. Countryside Bank*, 538 F.Supp. 1360, 1362 (N.D.Ill.1981) (noting Stathis's shift from traditional compliance rule to reasonable compliance standard). Reports of the demise of the strict compliance rule were exaggerated, however. A different division of the same Illinois Appellate Court noted in *Mt. Prospect St. Bk. v. Marine Midland Bk.*, 121 Ill.App.3d 295, 300–02, 76 Ill.Dec. 844, 848–49, 459 N.E.2d 979, 983–84 (1983), that strict compliance was still the majority rule, and suggested that it was particularly appropriate in cases under the UCP. The court in *Auto–Owners Ins. v. So. Side Tr. & S. Bk.*, 176 Ill.App.3d 303, 310, 126 Ill.Dec. 13, 18, 531 N.E.2d 146, 151 (1988), further read Mt. Prospect to be reasserting the primacy of the strict compliance rule, and expressly rejected a suggestion that it adopt a lesser exacting standard. The amended comments to § 5–114 note that "Mount Prospect strongly suggests that the strict compliance standard has been and is the rule in Illinois and that Stathis as a precedent may be a narrowly confined one." Ill.Ann.Stat. ch. 26, ¶ 5–114 general comment (Smith–Hurd.1988 supp.).

The court in Mt. Prospect approvingly quoted the summary of the strict compliance rule presented in *Courtaulds North America, Inc. v. N.C. Nat. Bank*, 528 F.2d 802, 805–06 (4th Cir.1975): "[T]he beneficiary must meet the terms of the credit—and precisely—if it is to exact performance of the issuer. Failing such compliance there can be no recovery from the drawee." A more hoary statement of the rule appears in Equitable Trust Co. of N.Y. v. Dawson Partners, Ltd. 27 Lloyd's Rep. 49, 52 (House of Lords 1926): "It is both common ground and common sense that in such a transaction the accepting bank can only claim indemnity if the conditions on which it is authorized to accept are in the matter of the accompanying documents strictly observed. There is no room for documents which are almost the same, or which do just as well."

The differences between the March 25 certificates and the requirements of the letters of credit are substantial. It is not clear from the face of the March 25 certificates that "any bond(s) or undertaking(s)" means "bond(s) or undertaking(s) at the request of Bill's Coal Company." For all that Continental Illinois knew, Occidental Fire and the Liquidator could have intended to apply the proceeds of the letters of credit to liabilities on other bonds besides those issued on behalf of Bill's Coal. Had this happened, and had Occidental Fire and/or the Liquidator refused to remit sums not needed to satisfy their Bill's Coal liabilities, Continental Illinois could have found itself facing suit from Bill's Coal for breach of duty. See Ill.Rev.Stat. ch. 26, ¶ 5–109(1)–(2) (issuer owes duty of good faith towards customer; suggests duty includes careful examination of documents to insure compliance). Adherence to the strict compliance rule allowed Continental Illinois to escape this problem, and placed the onus upon the beneficiaries to present conforming documents.

Occidental Fire's authorities do not indicate to the contrary of this court's view that the March 25 certificates did not strictly conform with the terms of the letters of credit. In *American Airlines, Inc. v. Federal Deposit Ins.*, 610 F.Supp. 199 (D.Kan. 1985), the court noted that under Kansas's view of the strict compliance standard, " 'a variance between documents specified and documents submitted is not fatal if there is no possibility that the documents could mislead the paying bank to its detriment.' " *Id.* at 202, quoting *Flagship Cruises, Ltd. v. New England Merchants*, 569 F.2d 699, 705 (1st Cir.1978) (emphasis in Flagship Cruises). The American Airlines court concluded that there was no possibility that

the Federal Deposit Insurance Corporation ("FDIC") could have mistaken American Airlines's documents as to the letter of credit reference number and the proper drawee bank—the only two variances in the drafts presented to the FDIC. *American Airlines*, 610 F.Supp. at 202. By contrast, the variances in the March 25 certificates raised a possibility that Continental Illinois would have been mistaken had it paid out on them. As for *Crist v. J. Henry Schroder Bank & Trust Co.*, 693 F.Supp. 1429 (S.D.N.Y.1988), the question there was whether a receiver—much like the Liquidator in this case—could succeed to the interests of a beneficiary under a letter of credit. Again the court determined from the documents presented that there was no possibility that the bank could have feared being mistaken in honoring the draft. Unlike in Crist, uncertainty abounds within the March 25 documents, and Continental Illinois had good grounds for dishonoring the accompanying drafts.

■ Occidental Fire contends that even if Continental Illinois had grounds for dishonoring the March 25 draw, it did so in an untimely fashion, and in a manner that particularly prejudiced Occidental Fire. The parties agree that Continental Illinois was obligated to give Occidental Fire and the Liquidator notice of dishonor within three business days of Continental Illinois' receipt of the draw. This means that Continental Illinois had to give notice to the parties no later than March 30, 1987 of its decision on the March 25 drafts, as a Saturday and a Sunday intervened. Notice under the UCP includes "stating the reasons therefor," and "must, without delay, be given by cable or other expeditious means. . . ." UCP, art. 8(e). Under Illinois law, the failure to state a reason for dis-

honor can work to estop a bank from later claiming that reason as a justification for dishonor. See *Stathis*, 90 Ill.App.3d at 812, 46 Ill.Dec. at 175, 413 N.E.2d 1288; *American Employers Ins. v. Pioneer Bank & Trust*, 538 F.Supp. 1354, 1357 (N.D.Ill.1981) (construing Illinois law); *American Nat. Bank & Trust v. Hamilton Industries*, 583 F.Supp. 164, 172 (N.D.Ill.1984) (same).

The parties agree that Continental Illinois informed Occidental Fire and the Liquidator that it would dishonor the drafts on March 30, through both Perez's and Shannon's calls. The parties, disagree as to whether those communications constituted proper notice under the UCP, or were made in such a way as to allow Continental Illinois to assert before this court the discrepancy in the "aforementioned bond(s) and undertaking(s)" as a reason for dishonor. Occidental Fire claims that Perez never mentioned the discrepancy; as for Shannon's call, Occidental Fire asserts that Shannon told Foley that his call was not a formal notice of dishonor.[2] The trier of fact will have to determine if Occidental Fire's factual assertions are true.

Another issue for the trier of fact will be whether Occidental Fire assented to the amendment of letter of credit No. 6328290. Of course, if Continental Illinois timely dishonored the March 25 drafts, then this issue is moot, as Occidental Fire presented no other valid draft under letter of credit No. 6328290, amended or otherwise. Continental Illinois' employees cannot recall whether Occidental actually approved the amendment, although there is evidence that Occidental had appointed someone, to act as its agent in this regard. Occidental Fire's Executive Vice President, James O. Eason, Jr., has not stated that Occidental Fire did not approve the amendment; all he

**2.** After the parties had briefed the cross-motions for summary judgment, Continental Illinois moved to strike Foley's affidavit on grounds that, as Occidental Fire's attorney, he could not present testimony consistent with his ethical obligations as Occidental Fire's counsel. See Ill.Ann.Stat. ch. 110A, Cannon 5–102(a) (Smith-Hurd 1985). Continental Illinois has cited no authority for striking an affidavit where it appears that submission of the affidavit raises ethical problems for the affiant. Rule 56(e),

Fed.R.Civ.P., permits this court to consider any evidence that would be admissible at trial, and despite Mr. Foley's ethical difficulties his evidence would be admissible. Mr. Foley can avoid these problems by either withdrawing his affidavit or withdrawing as counsel. Occidental Fire indicated in open court that it may consider the latter move. For the moment, the court will not strike Mr. Foley's affidavit, nor disregard its content in deciding the cross-motions for summary judgment.

says is that he cannot find a record indicating assent. The trier of fact will have to sort this problem out.

For the reasons stated in this opinion, this court grants Continental Illinois summary judgment on Count 2 of Occidental Fire's complaint, and decides that Continental Illinois had proper grounds for its dishonors of February 6 and March 25, 1987. All other motions are denied.