## OCCIDENTAL FIRE & CASUALTY COMPANY OF NORTH CAROLINA, Plaintiff,

v.

## CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant.

No. 88 C 6264.

United States District Court, N.D. Illinois, E.D.

Nov. 17, 1989.

Marvin Glassman, Rabens, Formusa & Glassman, Ltd. Chicago, Ill. and Peter M.

Foley, Leboeuf, Lamb, Lieby & Macrae, Raleigh, N.C., for plaintiff.

Francis J. Higgins and James L. Meador, Bell, Boyd & Lloyd, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIAN BARNETT DUFF, District Judge.

This suit came before this court for trial without a jury on September 7–8, 12, and 15, 1989. The court has heard the evidence and has considered the testimony, exhibits, memoranda of law, and arguments of counsel. Now fully advised in this matter, the full trial having been concluded, the court finds these facts:

1. Continental Illinois National Bank and Trust Company of Chicago is a national banking association with its principal place of business in Chicago, Illinois.

2. Occidental Fire & Casualty Company of North Carolina is a North Carolina corporation with its principal place of business in North Carolina. Occidental is engaged in the business of, among other things, writing surety bonds.

3. Occidental wrote 29 surety bonds for reclamation work on which Occidental was the obligor, the State of Kansas was the obligee, and Bill's Coal Company was the principal. The aggregate amount of these bonds was $4,239,816.

4. Occidental wrote these reclamation bonds at the request of Union Indemnity Insurance Company of New York. Union Indemnity could not issue the bonds because the State of Kansas had not licensed it as an insurer.

5. Union Indemnity reinsured the reclamation bonds 100%. Union Indemnity also wrote other bonds for Bill's Coal on which it was surety and in which Occidental had no interest.

6. In April and June 1984 Continental Illinois issued seven Irrevocable Standby Letters of Credit on the account of Bill's Coal Company. The aggregate face amount of these letters of credit was $2,069,000. According to Rodney Davis, an employee of Occidental, these letters were to approximate 45% of the amount of bonds issued by Occidental. The letters of credit defined the "beneficiary" of the letters of credit as:

UNION INDEMNITY INS. CO. OF N.Y. & OCCIDENTAL FIRE & CASUALTY CO. OF NORTH CAROLINA
AS THEIR RESPECTIVE INTERESTS MAY APPEAR
260 MADISON AVE., NEW YORK, N.Y. 10016
P.O. BOX 5946TA, DENVER COLO. 80217

7. The letters of credit required that, in the event of a draw, "you," the "beneficiary," must certify to the Bank that:

—You, as surety have executed or have procured the execution of bond(s) or undertaking(s) at the request of Bill's Coal Company, Inc., and that you have incurred liability in an amount not less than the amount of the accompanying sight draft(s), or that as of the close of business in Chicago on the day which is ten (10) days prior to the expiry date of this Letter of Credit you have received neither an amendment renewing this Letter of Credit for an additional year nor an acceptable replacement thereof.

—Any funds drawn under the Letter of Credit shall be held apart by you for the purpose of reimbursing any incurred liabilities of the *aforementioned bond(s) or undertaking(s)*.

—Should funds drawn not be used by you for the satisfaction of or reimbursement of any loss, cost, claim for expenses of any nature whatsoever, incurred by you, (including unpaid premiums) *on any such bond(s) or undertaking(s) as aforesaid*, such amounts shall be returned directly to [Continental Bank] ...

(Emphasis added.)

8. On October 29, 1984, at the request of Bill's Coal Company, Continental Illinois issued an amendment reducing the face amount of Letter of Credit No. 6328290 from $1,014,000 to $733,000. Bill's Coal asked for the reduction after the State of

Kansas released Occidental's bond No. 23252. Occidental was aware of the release of this bond. The bank's internal memorandum dated October 15, 1984 states that it had obtained the consent of the beneficiary to the amendment of Letter of Credit No. 6328290. It is undisputed that Union Indemnity gave its consent.

9. From September 1984 through March 1985, Rodney Davis was in charge of the National Risk Underwriting ("NRU") program through which Occidental wrote the Bill's Coal bonds. Mr. Davis did not consent to or authorize the consent to the reduction in Letter of Credit No. 6328290.

10. Cover X acted as a subagent to NRU in its bonding program. Antoinette Morabito was in charge of the collateral file at Cover X relating to the Bill's Coal bonds, which included matters relating to the disputed letters of credit. She does not recall a request for reduction in Letter of Credit No. 6328290 and her files show no evidence of either a request or a consent to reduce that letter. Her files did not contain all known materials relating to the Bill's Coal Bonds, however. It did not contain a response to a memorandum sent by Morabito to Eason, and it did not contain correspondence from Continental Illinois reflecting extensions of its letters of credit past March 31, 1986.

11. The first time that Occidental objected to the amendment of Letter of Credit No. 6328290, although it did not bring a claim of anticipatory repudiation, was in a complaint filed Feburary 19, 1987, in the U.S. District Court for the Eastern District of North Carolina. This was despite Occidental's knowing about the amendment allegedly for the first time in March 1986.

12. Bill's Coal Company became insolvent in 1985 and did not complete the reclamation work which it had promised to the State of Kansas.

13. The State of Kansas demanded that Occidental honor its obligations on its bonds. This demand resulted in an agreement between Occidental and the State of Kansas dated September 8, 1986. Bond No. 23252, which the State of Kansas released, was not one of the bonds which the agreement covered. Occidental has not lost any money on account of bond No. 23252.

14. Union Indemnity went into liquidation in 1985. The Superintendent of Insurance of the State of New York became Liquidator of Union Indemnity.

15. Occidental claims that it has incurred liability to the State of Kansas on the bonds in an amount exceeding the aggregate amount of the seven letters of credit.

16. The scheduled expiration time of the letters of credit, as extended by Continental Illinois, was 5:00 p.m. on March 31, 1987.

17. On February 6, 1987, Occidental attempted to draw unilaterally on the letters of credit. The sight drafts and certifications constituting the attempted draw did not include the signature or certifications of Union Indemnity or its Liquidator. The certificate and sight draft accompanying Letter of Credit No. 6328290 requested $733,000.

18. On February 11, 1987, Continental Illinois notified Occidental that it would not honor the attempted draw because the draft was drawn only by Occidental and not jointly with Union Indemnity.

19. In 1986 and to and including March 23, 1987 the Liquidator for Union Indemnity asserted rights and an interest in the letters of credit. During that period, the Liquidator demanded that Occidental return the letters of credit to the Liquidator, threatened legal action against Occidental if its demands were not met, and contended that it was entitled to use the proceeds of the letters of credit for any bonds written by Union Indemnity for Bill's Coal.

20. On March 25, 1987 Occidental and the Liquidator attempted a joint draw on the letters of credit, the proceeds of which they hoped to place in an escrow account until they resolved their differences over the application of the proceeds. Instead of using the underscored language quoted in Finding 7 above, however, the certifications accompanying the attempted draw stated:

Further, any funds drawn under this letter of credit shall be held apart by us for the express purpose of reimbursing any incurred liabilities for *any bonds or undertakings.*

Should funds drawn not be used by us for the satisfaction of or reimbursement of any loss, cost, claim for expense of any nature whatsoever incurred by us, (including unpaid premiums), *on any bond(s) or undertaking(s)* such amounts shall be returned directly to [Continental Bank] ...

(Emphasis added.)

21. On March 23 and 24, 1987, the attorneys for Occidental and the Liquidator drafted the certifications accompanying the attempted draw of March 25, 1987. One of Occidental's attorneys, Peter Foley, knew from an earlier draw and his firm's internal research about the importance of having conforming language. Nevertheless, as the last Occidental attorney to review the certifications accompanying the March 25 draw, he knowingly or recklessly allowed inclusion of the nonconforming language.

22. On March 24, 1987, Foley brought the certificates and sight drafts which the companies had prepared and the Liquidator had signed from New York to North Carolina. James Eason, an officer of Occidental, reviewed the documents.

23. The documents were given to John Livers, President of Occidental, for his signature. Livers believed Foley and Eason had reviewed the documents for form and content. Livers briefly reviewed the defective certificates and signed them.

24. The March 25, 1987 certificate and sight draft for Letter of Credit No. 6328290 requested $733,000.

25. Rodney Davis accompanied the documents on a flight to Chicago from North Carolina. He personally delivered the documents to Continental Illinois at approximately 1:30 p.m. on Wednesday, March 25, 1987.

26. Samuel Perez, an officer in Continental Illinois' Letter of Credit Department, received the draw documents on the afternoon of March 25, 1987 and noticed the language discrepancies indicated in Finding 20 above.

27. By Thursday, March 26, 1987 Perez determined that the certifications were nonconforming because they did not contain the language required by the letters of credit. Perez discussed this discrepancy with his supervisor, Frank Mrazek. Continental Illinois did not notify Occidental or the Liquidator of the discrepancy on March 26, 1987.

28. Mrazek and Perez discussed the discrepancies in the certification language again on the morning of Friday, March 27, 1989. Mrazek and Perez met with Robert Shannon, an attorney for Continental Illinois, at approximately 2:00 p.m. that day to discuss the draws. After 4:00 p.m. CST and after the close of business in the Eastern Time Zone, Continental Illinois decided that it would not honor the draw of March 25, 1987 because of, among other reasons, the deviations from the terms of the letters of credit set forth in Finding 20 above. Continental Illinois made no attempt to contact Occidental or the Liquidator on March 27, 1987.

29. On the morning of the next banking day, Monday, March 30, 1987, Perez informed Occidental by telephone that Continental Illinois had refused to honor the draw. Perez stated the specific reasons for refusal, including the language deviations set forth in Finding 20 above. Perez attempted three times (11:10 a.m., 11:57 a.m., and 3:42 p.m., CST) on March 30, 1987 to reach the responsible persons at the Liquidator's office to inform them of the bank's dishonor, but they were unavailable on March 30, 1987.

30. Following Perez's telephone call to Occidental, Livers and/or Eason relayed the substance of the Perez conversation to Foley.

31. Later on that same day, Shannon had a telephone conversation with Foley. In that conversation, Shannon specifically told Foley that one reason for the dishonor of the March 25, 1987 attempted draw was the nonconforming language set forth in Finding 20 above.

32. Following Foley's telephone conversation with Shannon, that same day Foley relayed to Eason and Livers the substance of his conversation, including the specific reasons for dishonor stated by Shannon.

33. On March 30, 1987, Continental Illinois sent to Occidental and the Liquidator, via Airborne Express Mail, written confirmations of Perez's telephonic notice of dishonor. These conformations noted the language discrepancies set forth in Finding 20 above. Occidental and the Liquidator received those written confirmations on March 31, 1987.

34. On March 30 and March 31, 1987, Occidental and the Liquidator had the means, had they chosen to use them, to resubmit certifications containing the language "aforementioned bond(s) or undertaking(s)" and "any such bond(s) or undertaking(s) as aforesaid," instead of "any bond(s) or undertaking(s)," prior to 5:00 p.m. CST on March 31, 1987. Those means included telex, electronic facsimile, and air travel.

35. On March 30, 1987, Occidental and the Liquidator did not attempt to resubmit certifications containing the language "aforementioned bond(s) or undertaking(s)" and "any such bond(s) or undertaking(s) as aforesaid," instead of "any bond(s) or undertaking(s)."

36. On March 31, 1987, Occidental and the Liquidator did not attempt to resubmit certifications containing the language "aforementioned bond(s) or undertaking(s)" and "any such bond(s) or undertaking(s) as aforesaid," instead of "any bond(s) or undertaking(s)."

37. The letters of credit expired by their terms at the end of business on March 31, 1987. The beneficiaries did not make a conforming draw before expiration.

38. In 1988 the Liquidator assigned to Occidental all of Union Indemnity's right, title and interest in the letters of credit.

## CONCLUSIONS OF LAW

■ This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (1982), and venue is proper in this court. On June 23, 1989, this court entered summary judgment in favor of Continental Illinois and against Occidental on two issues: first, that Continental Illinois did not act wrongfully in dishonoring Occidental's unilateral draw of February 6, 1987; second, that the bank had good grounds for dishonoring the attempted joint draft of Occidental and the Liquidator of March 25, 1987. This left two issues for trial: did Continental Illinois give Occidental timely and proper notice of its reason for dishonoring the March 25, 1987 attempted draw, and did Occidental consent to amendment of Letter of Credit No. 6328290. See *Occidental Fire & Cas. v. Continental Ill. Nat.*, 718 F.Supp. 1364 (N.D.Ill.1989).

As noted in this court's prior ruling, Continental Illinois had to give notice to Occidental no later than March 30, 1987, of its decision to dishonor the March 25, 1987 drafts. Notice under Article 8(c) of the International Chamber of Commerce's Uniform Customs and Practice for Documentary Credits (Rev. ed. 1974) (hereafter "UCP"), a document which governed the letters of credit at issue in this case, includes "stating the reasons therefor" and "must, without delay, be given by cable or other expeditious means...."

The court has found that Samuel Perez, an officer in Continental Illinois' Letter of Credit Department, gave notice of dishonor and the reasons for dishonor to Occidental by telephone on the morning of March 30, 1987. See Finding 29. Perez's testimony was credible in all respects, and the court gives it full weight. Occidental for its part does not dispute that telephonic communication is an expeditious means of communication under the UCP. The company does dispute, however, whether Continental Illinois had a duty to communicate its notice sooner. Occidental does not present any authority that the UCP's exhortation to avoid delay overcomes the statutory presumption of Ill.Rev.Stat. ch. 26, ¶ 5–112(1) (1987), that a bank which has acted within three business days has acted in a timely fashion. See William D. Hawkland and Tom L. Holland, 5 Uniform Commercial Code Series § 5–112:01 (Article 5) (1984)

(three days reasonable time under UCP). Nevertheless, based on the evidence presented, the court finds that Continental Illinois acted with reasonable speed in this case. The bank did not decide to dishonor the March 25 draw until late in the day on March 27, 1989. It notified Occidental early on the next business day. See Findings 28–29. The bank did not delay unduly in notifying Occidental of the nonconforming language of the March 25 drafts.[1]

▮ Occidental argues that notwithstanding the bank's proper notice to Occidental on March 30, 1987, it failed to notify the Liquidator, and thus its notice was defective. Occidental argues that § 5–112 of the UCC implies that a bank which is presented with a draft must transmit its notice of dishonor to the presenter of the draft. Occidental submits that the presenters in this case were it and the Liquidator, as each signed the draft documents. The term "presenter" in § 5–112 has a specific meaning, however: it is "any person presenting a draft or demand for payment under a credit...." Ill.Rev.Stat. ch. 26 at ¶ 5–112(3). In this case, Occidental presented the draft, not the Liquidator. See Finding 25. The bank's notice to Occidental thus satisfied whatever requirements are implied within § 5–112 as to the proper recipients of notice.[2]

▮ The court now turns to the issue of whether Continental Illinois properly amended Letter of Credit No. 6328290 in October 1984. In the court's prior ruling, the court suggested that if it were to rule that Continental Illinois gave proper notice to Occidental of its dishonor of the March 25, 1987 draw, this issue would be moot, as Occidental and the Liquidator never would have made a proper demand on the bank under either the original letter of credit or

the amended version. See *Occidental Fire*, 718 F.Supp. at 1371. Occidental, however, directs the court to § 5–115(2) of the UCC, which states:

> When an issuer wrongfully cancels or otherwise repudiates a credit before presentment of a draft or demand for payment drawn under it the beneficiary has the rights of a seller after anticipatory repudiation by the buyer under Section 2–610 [of the UCC] if he learns of the repudiation in time to reasonably avoid procurement of the required documents. Otherwise the beneficiary has an immediate right of action for wrongful dishonor.

Ill.Rev.Stat. ch. 26 at ¶ 5–115(2). Judge Hart observed in *Atari, Inc. v. Harris Trust and Sav. Bank*, 599 F.Supp. 592, 600–01 (N.D.Ill.1984), *aff'd in part and rev'd in part without opinion*, 785 F.2d 312 (7th Cir.1986), that Illinois' version of § 5–115(2) does not carry a requirement that the beneficiary demonstrate that it could present a conforming draw in order to bring an action for wrongful dishonor. Occidental did not present this authority to the court in contesting Continental Illinois' motion for summary judgment, but nevertheless Occidental is entitled to a determination of the merits of its claim for anticipatory repudiation.

As in any case for breach of contract under Illinois law, the plaintiff bears the burden of proving the breach. See *Perlman v. Time, Inc.*, 133 Ill.App.3d 348, 353, 88 Ill.Dec. 524, 529, 478 N.E.2d 1132, 1136 (1985); *Vandevier v. Mulay Plastics, Inc.*, 135 Ill.App.3d 787, 791, 90 Ill.Dec. 558, 561, 482 N.E.2d 377, 380 (1985). The court concludes that Occidental has not proven by a preponderance of the evidence that Continental Illinois reduced the face value of

1. Occidental presented no evidence that it was impossible for it and the Liquidator to avoid the problem they faced with the impending expiration date by submitting a draw sooner. The problems which Occidental and the Liquidator faced in turning papers around in time to draw before expiry were of their own making. So too was their inclusion of nonconforming language.

2. Even if the Liquidator deserved separate notice, the court determines that it received it. If

the Liquidator could present its draft through Occidental, then it certainly could have received notice through Occidental. Section 5–112 directs the bank to look to the presenter; if Continental Illinois had to assume that Occidental was acting as a "presenter" on behalf of itself and the Liquidator, then it could presume properly that by notifying the joint presenter, Occidental, it had notified both parties.

Letter of Credit No. 6328290 without its consent. Those persons who worked for Occidental on the Bill's Coal account stated that they did not consent or could not recall giving such consent. Continental Illinois has no direct record of Occidental's consent, although a contemporaneous internal memorandum states that consent was obtained.

A reduction in the value of the letter of credit was, however, logical. The State of Kansas had released Occidental from its bond No. 23252, and Occidental was aware of the release. Even if Occidental did not give contemporaneous consent, its subsequent acts indicate that it consented to the reduction. The certificates and drafts accompanying the abortive February 1987 and March 1987 draws ask Continental Illinois to pay the reduced amount of the letter, $733,000—this despite Occidental's knowing about the amendment allegedly for the first time in March 1986. Only after Continental Illinois rejected the February 1987 draw did Occidental record its first objection to the amendment, and even then, Occidental did not see fit to claim anticipatory repudiation. See Findings 8–11, 13, 17, 24.[3]

Accordingly, the court enters judgment in favor of Continental Illinois and against Occidental on Count I of Occidental's complaint.

---

**3.** Even if Occidental had not consented, it has presented no evidence that it was harmed by the bank's breach. The State of Kansas had re-leased the obligation which the reduced portion of the letter of credit collateralized. See Findings 8, 13.