OCCIDENTAL FIRE & CASUALTY
COMPANY OF NORTH
CAROLINA, Plaintiff–Appellant,

v.

CONTINENTAL BANK N.A.,*
Defendant–Appellee.

No. 89–3717.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1990.
Decided Nov. 27, 1990.

---

* Formerly known as Continental Illinois National    Bank and Trust Company.

Dennis C. Waldon, Monica L. Thompson, Edward H. Rice, Keck, Mahin & Cate, Marvin Glassman, Rabens, Formusa & Glassman, Chicago, Ill., Peter M. Foley, Le-Boeuf, Lamb, Leiby & Macrae, Raleigh, N.C., for plaintiff-appellant.

Francis J. Higgins, James L. Meador, Carol A. Genis, Bell, Boyd & Lloyd, Chicago, Ill., for defendant-appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Occidental Fire & Casualty Company contends that Continental Bank N.A. wrongfully dishonored Occidental's attempt to draw the proceeds of seven letters of credit of which Occidental was a co-beneficiary. The district court decided in Continental's favor, and Occidental appeals. We affirm.

## I. FACTS

In 1984, Bill's Coal Company contracted to perform mine reclamation work in Kansas. Kansas required Bill's Coal to obtain a surety to cover the reclamation work. Bill's Coal asked Union Indemnity Insurance Company of New York to provide the required surety bonds, and Union, which was not licensed to issue such bonds in Kansas, requested Occidental to write the bonds. In return, Union agreed to provide 100% reinsurance of the bonds. Occidental thereupon issued 29 reclamation bonds in an aggregate penal amount of $4,239,816.00. As collateral for the bonds, Occidental and Union required Bill's Coal to obtain letters of credit in their favor. Continental issued seven irrevocable letters of credit on behalf of Bill's Coal in a total amount of $2,069,000.00. The letters listed as the beneficiary "Union Indemnity Ins. Co. of N.Y. & Occidental Fire & Casualty Co. of North Carolina as their respective interests may appear." Joint App. tab 5. The letters of credit were initially due to expire on March 31, 1985, but they were extended twice, each for a period of one additional year. According to their terms, the letters were to be governed by Illinois law and the 1974 version of the Uniform Customs and Practice for Documentary Credits of the International Chamber of Commerce (the "UCP").

In October 1984, Bill's Coal requested Continental to reduce the face amount of letter of credit no. 6328290 from $1,014,000.00 to $733,000.00. Bill's Coal evidently asked for the reduction because Kansas had released one of the surety bonds. Occidental was aware the bond had been released, and there is no dispute that Union consented to the reduction of the value of letter no. 6328290.

In August 1985, Union went into liquidation, and the New York Superintendent of Insurance became its Liquidator. Pursuant to New York law, the Liquidator assumed control of Union and stood in for Union with respect to the transaction at issue here. Four months later, Bill's Coal was declared bankrupt. Because Bill's Coal had not completed the reclamation

work, Kansas made a claim on the bonds. In September 1986, Occidental entered an agreement with Kansas according to which Occidental would forfeit $449,718.00 of the bonds to Kansas and would arrange for a contractor to complete the reclamation. Occidental claims that it incurred a total liability of $2,336,915.81 as a result of the default of Bill's Coal.

Occidental made several attempts, both with and without the participation of the Liquidator, to collect the value of the letters of credit. In March 1986, Occidental and the Liquidator attempted a joint draw based on a term in the letters that permitted a draw if the beneficiaries had not received by the tenth day prior to the letters' expiration an amendment extending the expiration date for another year or an acceptable replacement of the letters. Continental dishonored the draw, having already extended the expiration date of the letters to March 31, 1987. In December 1986 and again in February 1987, Occidental attempted a unilateral draw, and Continental rejected both attempts because the Liquidator had not participated. On March 25, 1987, Occidental and the Liquidator made a final joint attempt to draw on the letters, but the draw was rejected, for reasons we detail below, on March 30, 1987. Occidental and the Liquidator, neither jointly nor unilaterally, made any further draw attempts, and the letters expired by their terms at 5:00 p.m. on March 31, 1987. Subsequently, the Liquidator assigned all of Union's rights and interests in the letters to Occidental.

Occidental challenges only Continental's rejection of the February and March 1987 attempts. First, Occidental argues that the letters of credit permitted a unilateral draw by Occidental and that Continental's rejection of the February 1987 draw therefore breached the terms of the credit. Second, Occidental objects that Continental's decision to dishonor the March 1987 joint draw was made untimely and without sufficient notice to the Liquidator. Lastly, Occidental argues that it never consented to the reduction in the face value of letter no. 6328290 and that Continental's reduction of that letter without its consent constituted an anticipatory repudiation of the credit. We address each of these points in turn, supplying additional factual background as necessary.

## II. THE FEBRUARY 1987 UNILATERAL DRAW

The district court granted summary judgment in favor of Continental on Occidental's complaint that Continental had wrongfully dishonored the February 1987 unilateral draw. *Occidental Fire & Casualty Co. of N.C. v. Continental Ill. Nat'l Bank and Trust Co. of Chicago*, 718 F.Supp. 1364 (N.D.Ill.1989). Interpreting the language of the letters of credit, the district court concluded that the letters required a joint draw by Occidental and Union.[1] We agree.

The letters of credit list as beneficiary both Occidental and Union. The modifying phrase "as their respective interests may appear" does not alter the plain meaning of the beneficiary designation. Indeed, the phrase "as their respective interests may appear" is a common means of releasing a sum of money to two or more parties jointly. The issuer of the payment may in some instances be required to ascertain the rela-

---

**1.** Of course, a joint draw by Occidental and the Liquidator would also have sufficed. In rejecting the March 25 joint draw, Continental suggested that the Liquidator might not be a proper party to the draw, since he was not a named beneficiary of the letters of credit. *See* Joint App. tab 10 (letter of March 27, 1987, from Robert Shannon, attorney for Continental, to Peter Foley, attorney for Occidental, and Stephen Doody, attorney in Liquidator's office); Joint App. tab 11 (letter of March 30, 1987, from Samuel Perez of Continental to Occidental). The draw documents make clear that the Superintendent of Insurance was signing the certifica-

tion as Union's Liquidator—Union itself no longer existed. Joint App. tab 9. Continental's position in this regard, therefore, could not have justified its rejection of the joint draw. *See Pastor v. National Republic Bank of Chicago*, 76 Ill.2d 139, 28 Ill.Dec. 535, 539–40, 390 N.E.2d 894, 898–99 (1979) (receiver for named beneficiary of irrevocable letter of credit—insolvent insurance company—was entitled to draw on credit). When we refer to the requirement of the letters of credit that Occidental and Union jointly submit a draw, we in no way reflect any doubt about the Liquidator's right to assert Union's interest in the letters.

tive interests of the payees. But both parties to this litigation readily agree that the independence principle, which is recognized by both Illinois law and the UCP, prohibits the issuer of a letter of credit from looking at any material or facts other than those appearing in the draw documents themselves. *See* Ill.Rev.Stat. ch. 26, § 5–114(1); UCP art. 8(c), *reprinted in* Joint App. tab 4; *Mount Prospect State Bank v. Marine Midland Bank,* 121 Ill.App.3d 295, 76 Ill. Dec. 844, 848, 459 N.E.2d 979, 983 (1st Dist.1983). Thus, Continental had no obligation under the terms of the credit—and no right under Illinois law and the UCP—to inquire into the respective interests of the joint beneficiaries in the proceeds of the letters.

Further, as the district court observed, the content of the letters do not suggest that anything other than a joint draw by Occidental and Union was contemplated. The letters contain no language referring to "either one of you" or "both of you"— instead the unmodified pronoun "you" is employed throughout. Since the beneficiary designation refers to Occidental *and* Union (rather than Occidental *or* Union), we believe that the letters on their face required a joint draw by both co-beneficiaries.

Recognizing that the letters of credit were simply a specialized type of contract, the district court looked to the parties' conduct as evidence of their intentions regarding the question whether a joint draw was required. Occidental correctly observes that a court may consider extrinsic evidence concerning the meaning of contractual language only when the contract itself is ambiguous. *See A.A. Conte, Inc. v. Campbell–Lowrie–Lautermilch Corp.,* 132 Ill.App.3d 325, 87 Ill.Dec. 429, 432, 477 N.E.2d 30, 33 (1st Dist.1985). In this case, the district judge, upon reviewing the extrinsic evidence, concluded that the parties' conduct bolstered his initial interpretation of the contractual language regarding the necessity of a joint draw. The district judge noted that the Liquidator had protested to Occidental about Occidental's unilateral attempt to draw on the letters in December 1986 and February 1987, and

there was additional evidence about a dispute between the Liquidator and Occidental concerning possession of the original letters. We do not find these facts helpful, however, since the Liquidator's subsequent conduct in defense of Union's bankrupt estate is not persuasive evidence of Union's intent at the time the letters were issued. The district court also referred to two letters sent in July 1986 and January 1987 by Peter Foley, an attorney for Occidental, to the Liquidator's office in which Foley appeared to agree that a joint draw was required. It may be that Foley was trying to appease the Liquidator in order to persuade him to join Occidental in a draw, particularly after Occidental's failed unilateral attempt in December 1986. In any event, these letters fall far short of convincing proof with respect to the parties' intent concerning joint or unilateral draws.

We do not find the extrinsic evidence considered by the district court particularly instructive, but that does not alter our conclusion that the letters of credit plainly required a joint draw by Occidental and Union. Consequently, we do not address Occidental's argument that any ambiguity in the language of the letters of credit should be construed against Continental, which issued the letters and presumably drafted the form on which the terms of the credit were specified.

Occidental finally argues that the district court's determination that the letters of credit required a joint draw is inconsistent with the conclusion that Continental satisfied the notice requirement by advising only Occidental of the dishonor of the draw. We observe no inconsistency in the district court's rulings. Whether Continental was legally required to inform both beneficiaries of the credit that their joint draw had been dishonored is an entirely separate issue from the requirement appearing on the face of the letters that both beneficiaries participate in any draw on the credit. In any event, as we discuss in greater detail below, the district court concluded that the Liquidator did receive legally effective notice of the dishonor. Thus, Occidental's appeal on this ground fails.

## III. The March 25, 1987, Joint Draw

With the expiration of the letters of credit rapidly approaching, Occidental persuaded the Liquidator to join it in a draw on the credit. The co-beneficiaries agreed to place the proceeds in an escrow account until the co-beneficiaries could work out an agreement or obtain a court judgment declaring their respective rights to the money. Thus, Occidental and the Liquidator together prepared the draw documents, and Rodney Davis—the head of the National Risk Underwriting Program through which Occidental had issued the Bill's Coal bonds—personally delivered them to Continental's offices in Chicago at about 1:30 p.m. CST on March 25, 1987.

The letters required the co-beneficiaries to make the following certification:

—You, as surety have executed or have procured the execution of bond(s) or undertaking(s) at the request of Bill's Coal Company, Inc., and [ ] you have incurred liability in an amount not less than the amount of the accompanying sight draft(s), or that as of the close of business in Chicago on the day which is ten (10) days prior to the expiry date of this Letter of Credit you have received neither an amendment renewing this Letter of Credit for an additional year nor an acceptable replacement thereof.

—Any funds drawn under this Letter of Credit shall be held apart by you for the express purpose of reimbursing any incurred liabilities of the *aforementioned* bond(s) or undertaking(s).

—Should funds drawn not be used by you for the satisfaction of or reimbursement of any loss, cost, claim for expense of any nature whatsoever incurred by you, (including unpaid premiums), on *any such* bond(s) or undertaking(s) *as aforesaid*, such amounts shall be returned directly to Continental Illinois National Bank and Trust Company of Chicago, Chicago, Illinois....

Joint App. tab 5 (emphasis added). But the draw documents made the following certification:

[A]ny funds drawn under this Letter of Credit shall be held apart by us for the express purpose of reimbursing any incurred liabilities for *any* bond(s) or undertaking(s).

Should funds drawn not be used by us for the satisfaction of our reimbursement of any loss, cost, claim for expense of any nature whatsoever incurred by us, (including unpaid premiums), on *any* bond(s) or undertaking(s), such amounts shall be returned to Continental Illinois National Bank and Trust Company of Chicago, Chicago, Illinois....

Joint App. tab 9 (emphasis added). Thus, the certification contained in the draw documents failed to conform exactly (with respect to the specification of the bond or undertaking) to the certification required by the letters of credit.

Occidental concedes on appeal that it submitted a nonconforming draw.[2] However, Occidental argues that Continental nevertheless improperly dishonored the draw, since Continental allegedly delayed too long before notifying Occidental of the nonconformity and failed to give adequate notice of the problem to the Liquidator. The district court held a bench trial on this issue. *Occidental Fire & Casualty Co. of N.C. v. Continental Ill. Nat'l Bank and Trust Co. of Chicago*, 725 F.Supp. 383 (N.D.Ill.1989). We shall summarize the court's factual findings as they relate to the issues on appeal.

The draw documents were received by Samuel Perez, an officer in Continental's letter of credit department whose testimony the district court deemed wholly credible. Perez testified that he noticed the language discrepancies in the certification on the afternoon of March 25—the same day the draw documents were delivered. By Thursday, March 26, he had determined that the draws were nonconforming, and he

---

**2.** At the summary judgment stage, Occidental argued that the nonconformities were insignificant. The district court concluded, as a matter of Illinois law, that strict conformity is required and that, in any event, the particular nonconformity was not insubstantial. 718 F.Supp. at 1369-70. Occidental has abandoned this argument on appeal, and we do not consider it.

discussed the problem with his supervisor, Frank Mrazek. Mrazek and Perez again discussed the issue the next day, Friday, March 27, and they met with Robert Shannon, an attorney for Continental, at 2:00 p.m. that same day. After 4:00 p.m. CST (and, therefore, after the close of business in the East), the three concluded their meeting and determined that Continental would dishonor the draw because of, *inter alia,* the language nonconformities. No one at Continental made any effort that day to contact either Occidental or the Liquidator. Shannon did, however, draft a letter of "concerns" that afternoon, but the co-beneficiaries did not receive that letter until March 30.

On the next banking day—Monday, March 30, the day before the letters were due to expire—Perez telephoned Occidental and informed it of the dishonor and the reasons for it, including the language discrepancies. Perez attempted three times (at 11:10 a.m., 11:57 a.m. and 3:42 p.m. CST) to contact the responsible people at the Liquidator's office, but to no avail. Perez did ultimately receive a return phone call from the Liquidator on the morning of March 31, at which time he informed the Liquidator of the dishonor and the reasons for it. Later in the day on March 30, Shannon spoke with Peter Foley, Occidental's attorney who had prepared the draw documents. Shannon, too, advised Foley of the reasons for the dishonor, including the nonconforming certification. Foley related his conversation with Shannon to two of his associates, specifically mentioning the language nonconformity.

Perez sent written confirmation of the dishonor to the co-beneficiaries on March 30 via Airborne Express mail. In this letter, Perez stated that Continental had determined that the draw documents "on their face are not in compliance with the terms of the respective Letters of Credit" and observed the following three "discrepancies":

(1) The statement does not specifically indicate the names of Union Indemnity Insurance Company of New York and Occidental Fire and Casualty Company of North Carolina as sureties who have executed or have procured the execution of bond(s) or undertakings [sic] at the request of Bill's Coal Company, Inc., and incurred liability.

(2) The statement refers to liabilities for "any bond(s) or undertaking(s)" instead of to the "aforementioned bond(s) or undertaking(s)", and to any loss, cost, claim for expense on "any bond(s) or undertaking(s)", instead of on "any such bond(s) or undertaking(s) as aforesaid".

(3) The draft and statement are cosigned by the Director of Financial Operations of the Liquidation Bureau State of New York Insurance Department as Liquidator of Union Indemnity Insurance Company of New York. Mr. Robert Shannon of our Law Department is simultaneously contacting you in this respect.

Joint App. tabs 11, 12.

Occidental and the Liquidator made no further draw attempt, and the letters expired by their terms on March 31, 1987, at 5:00 p.m. CST. The district court found that Occidental and the Liquidator could have made a last minute draw attempt before the expiration by means of electronic facsimile, telex or air travel.

■ Essentially, Occidental charges Continental with bad faith in dishonoring the March 1987 draw attempt. The Illinois Uniform Commercial Code (the "Illinois UCC") contains a general good faith requirement that applies to all transactions subject to the UCC. Ill.Rev.Stat. ch. 26, § 1–203. Of course, whether Continental acted in good faith in reviewing the documents and notifying the beneficiaries of the observed defects is a question of fact. We will reverse a district court's findings of fact in a bench trial only upon a showing that the district court's findings were clearly erroneous, Fed.R.Civ.P. 52(a), not merely because we, had we been in the district court's place, would have arrived at different findings. *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ The district court here specifically found that Continental acted with reasonable speed in advising the beneficiaries of the rejection of their draw. The district court referred to applicable provisions of the Illinois UCC and the UCP. The Illinois UCC allows banks three business days to review the documents. Ill.Rev.Stat. ch. 26, § 5–112(1)(a). The UCP states more generally that "[t]he issuing bank shall have a reasonable time to examine the documents and to determine" whether to honor or dishonor the draw. UCP art. 8(d).[3] If the bank does decide to dishonor, "notice to that effect, stating the reasons therefor, must, *without delay,* be given by cable *or other expeditious means* " to the remitting party. UCP art. 8(e) (emphasis added). The Illinois UCC does not discuss how quickly notice of dishonor must be relayed to the remitting party; instead, the general requirement of good faith governs the manner in which notice is effected.

The district judge heard competing versions of the facts underlying the dishonor: after reviewing the evidence, he gave full weight to Perez's testimony. Occidental has not shown that this credibility determination was clearly erroneous. Although Perez immediately noticed the language discrepancies, he did not resolve at that first glance to reject the draw. The UCP recognizes that the issuing bank might notice some nonconformity appearing on the face of the draw documents but still require time to consider whether the nonconformity requires rejection of the draw. *See* UCP art. 8(c). Further, there is some question whether Perez possessed the authority to reject the draw without the approval of Mrazek and Shannon. Certainly, there is no evidence (other than Occidental's innuendos) that Continental deliberately delayed its consideration of the draw; according to Perez's fully credited testimony, Perez, Mrazek and Shannon simply did not reach the decision to deny the draw until the conclusion of the second banking day following the submission of the draw documents. Since the three made their decision after 5:00 EST—normally recognized as the close of business in the East—they did not attempt to contact the beneficiaries until the next business day—Monday. It might have been a more careful procedure to attempt to reach Occidental or the Liquidator late Friday, but the district court did not clearly err in concluding that the decision to make the calls on Monday was reasonable under the circumstances.

■ Occidental argues that unequivocal notice of the reasons for dishonor of the draw is required. Although neither the Illinois UCC nor the UCP specifically states that a bank must give unambiguous reasons for dishonor of a sight draft, we think such a rule comports with the general good faith requirement. As the basis for its claim here, Occidental complains that Continental's notice to it was defective because neither in Perez's telephone call nor in Perez's confirming letter was the language nonconformity unambiguously declared to be the reason for the bank's dishonor of the draw. Further, Occidental claims that it was confused about the true reason for the dishonor because the written and oral communications it received from Perez and Shannon listed a multitude of "concerns," which Occidental labels as largely frivolous.

■ Arguably, if the various "concerns" articulated by Perez and Shannon were so

---

3. Occidental purports to perceive a conflict between the more specific time allotment for review of draw documents given by the UCC and the more general time frame stated in the UCP. *See* Appellant's Br. at 39 n. 15. As we have already observed, both Illinois law and the UCP govern these letters of credit. We agree with the district court that there is no necessary conflict between the two provisions in the circumstances of this case. Indeed, it is entirely possible that the UCP would allow an issuing bank more than three business days to review draw documents under some circumstances.

*See* J. Dolan, *The Law of Letters of Credit,* ¶ 4.06(2)(b) (1984) (citing cases). Certainly, the issuing bank is not required to drop everything—including other letter of credit draw submissions—just because a beneficiary has decided to delay submitting a draw until less than a week before the letter of credit expires. Thus, the district court did not err as a matter of law when it concluded that Continental had three business days to review the joint draw, nor did it err as a matter of fact in finding that Continental acted reasonably under the circumstances.

obviously frivolous, Occidental could have ignored those statements and gravitated to the simple technical deficiency—the language nonconformity—as the only valid reason for the dishonor. Occidental alleges that in his telephone call on the morning of March 30, Perez listed as one of the grounds for the denial "technical deficiencies," but that he did not specify what the deficiencies were. It is incomprehensible to us, as it evidently also was to the district court, that an experienced attorney like Foley would not demand to know the specific reasons for the dishonor if he were told simply that the draw was denied due to "technical deficiencies." Further, Foley spoke with Shannon later that same day, and he therefore had an additional opportunity to determine the precise nature of the "technical deficiencies." In any event, the district court gave full weight to Perez's testimony that he did tell Occidental's attorneys specifically about the language nonconformity. In addition, the district court found that Foley knew before submitting the March 1987 draw papers that absolute conformity to the language of the letters would be essential for a successful draw on the credit. He had had an associate at his law firm research the issue, and the associate had drafted a memorandum acknowledging Illinois's adherence to the strict conformity principle. Further, after discussing the reasons for the dishonor with Shannon by telephone, Foley told two of his associates that one of the reasons given by Shannon for the dishonor of the draw was the language nonconformity. Whether the the bank unambiguously notified Occidental of the specific reasons for the dishonor is a question of fact: the trial court did not clearly err in concluding that Occidental knew that the language nonconformity was a reason for the dishonor.

■ We agree with Occidental, however, that the list of "concerns" expressed by Shannon in his letter of March 27 to the beneficiaries and the first and third reasons for the dishonor stated in Perez's confirm-

ing letter would not alone have provided any valid reason for the bank to dishonor the joint draw. Those "concerns" challenged the Liquidator's right to participate in the draw as Union's legal representative because the Liquidator was not a "named beneficiary" and also questioned how the credit would be applied after the draw and whether Occidental had incurred sufficient liability under the specific bonds covered by each particular letter of credit. Joint App. tabs 10, 11.[4] Clearly, the Liquidator was a proper party to the draw, as we have already observed. *See supra* note 1. As for Continental's other "concerns," a dishonor of a draw on those bases would certainly have required the bank to look beyond the documents, an action prohibited by the independence principle which Continental has successfully raised here as a shield for its dishonor of the February 1987 draw attempt. Thus, while Continental asserted a number of improper reasons for the dishonor (some in the form of "concerns" about any future draw attempt by Occidental and the Liquidator), it also gave one valid reason—the language discrepancy—and it prevails here only because of that proper ground for the dishonor.

■ In its capacity as assignee of the Liquidator's claims, Occidental next charges that Continental failed to impart to the the Liquidator timely notice of the dishonor. Relying on the Illinois UCC and the UCP, the district court determined that the bank was required to inform only Occidental, as "presenter" of the draw documents, of the dishonor. Occidental argues that both beneficiaries were "presenters" and, therefore, both were entitled to notice of the dishonor. Illinois UCC section 5–112(3) defines a "presenter" as "any person presenting a draft or demand for payment for honor under a credit even though that person is a confirming bank or other correspondent which is acting under an issuer's authorization." But Occidental has pointed to no provision of the UCC which states

---

**4.** In *Eakin v. Continental Ill. Nat'l Bank and Trust Co. of Chicago,* 875 F.2d 114 (7th Cir. 1989), another case involving Bill's Coal bonds and an insolvent insurance company, we reject-

ed similar claims made by Continental in defense of its dishonor of a conforming draw made by the insurance company's liquidator as constituting bad faith.

who must be notified in case of dishonor. The UCP, on the other hand, presumes that the sight draft will ordinarily be presented to the issuing bank by another financial institution and instructs that notice of a dishonor is to be communicated to the *remitting bank*—not directly to the beneficiary or beneficiaries of the credit. UCP art. 8(e).[5] Since the remitting bank typically acts as an agent for the beneficiary of the credit, notice to the remitting bank legally constitutes notice to the beneficiary. In this regard, the district court reasoned that Occidental had acted on its own behalf and as an agent for the Liquidator in presenting the sight draft and that, therefore, Continental properly discharged its duty of notice simply by contacting the Liquidator.

In any event, it appears that Continental did give the Liquidator legally effective notice of the dishonor. Under Illinois UCC section 1–201(26),

> A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.

Perez, whose testimony was fully credited by the district court, stated at trial that he made three attempts to reach the responsible people at the Liquidator's office by telephone on March 30. These attempts satisfied the bank's obligations, assuming it had any, to provide the Liquidator with notice of the dishonor. Occidental insinuates that Perez made the phone calls at times of the day when he should have known the Liquidator would be unavailable (*i.e.,* during the lunch hour and near the close of business in the East). These suggestions of bad faith are completely unfounded, and we therefore reject them.

■ Finally, Occidental charges that Continental was barred by waiver or estoppel from dishonoring the March 1987 draw because it had not mentioned the language

nonconformity when it advised Occidental that it was dishonoring the March 1986 and December 1986 draw attempts. The district court declined to permit Occidental to submit proof on this theory at the bench trial because Occidental had not raised the argument at the summary judgment stage. Under Federal Rule of Civil Procedure 56(d), which deals with partial grants of summary judgment, the district court may issue an order, similar to a pretrial order, listing the facts that are not in dispute. Such an order is binding as to those facts. In this case, it appears that the district court entered neither a Rule 56(d) order nor a pretrial order definitively listing the issues for trial. Therefore, we will review the evidence that Occidental states it would have offered on this issue at trial. If the evidentiary proffer were sufficient, we would remand to the district court for further factfinding.

But, even construing the evidence proffered by Occidental on its waiver and estoppel claims most favorably to Occidental, we find no basis for remand. Illinois law defines waiver as "the intentional abandonment or relinquishment of a known right." *Washburn v. Union Nat'l Bank and Trust Co. of Joliet,* 151 Ill.App.3d 21, 104 Ill.Dec. 242, 245, 502 N.E.2d 739, 742 (App.3d Dist.1986); *accord Wald v. Chicago Shippers Ass'n,* 175 Ill.App.3d 607, 125 Ill.Dec. 62, 71, 529 N.E.2d 1138, 1147 (1st Dist.1988); *UIDC Management, Inc. v. Sears, Roebuck and Co.,* 167 Ill.App.3d 81, 117 Ill.Dec. 813, 815, 520 N.E.2d 1164, 1166 (1st Dist.1988); *Northern Trust Co. v. Oxford Speaker Co.,* 109 Ill.App.3d 433, 65 Ill.Dec. 113, 117, 440 N.E.2d 968, 972 (1st Dist.1982). Waiver may be express or implied from a party's conduct, *Wald,* 125 Ill.Dec. at 71, 529 N.E.2d at 1147, but the evidence must show a "clear, unequivocal and decisive act of a party" demonstrating an intent to waive the known right. *Washburn,* 104 Ill.Dec. at 245, 502 N.E.2d at 742.

---

**5.** Since the letters of credit at issue here were governed by the 1974 version of the UCP, Occidental is not assisted by article 16d of the 1983 Revision of the UCP, which requires that notice of a dishonor be given to the beneficiary of the credit. *See Kerr–McGee Chem. Corp. v. FDIC,* 872 F.2d 971, 973 (11th Cir.1989).

Construing the facts most favorably to Occidental, we cannot find that Continental waived its right to object to the language nonconformity in March 1987 simply because it did not notice this particular problem in the 1986 draws. Each of those draws was dishonored for another (apparently valid) reason. Continental dishonored the March 1986 draw attempt because it was submitted pursuant to a particular term of the letters. That term permitted a draw in the event that the beneficiaries had not received by the tenth day prior to the expiration of the letters an amendment extending the letters or an acceptable replacement of the credit. The draw attempt in question was made on March 24, 1986, and the letters had already been extended by the bank—evidently at the request of Bill's Coal—on March 20, 1986. On the other hand, Continental dishonored the December 1986 draw because it was a unilateral attempt by Occidental. Once Continental had articulated its reasons for dishonoring these draws, it probably waived its right to raise other bases—including the language nonconformity—for the dishonor of those particular draws; thus, had Occidental successfully challenged in court Continental's asserted reasons for dishonoring those particular draws, Continental most likely could not have defended the dishonor by noting to the court that the language nonconformity constituted an additional ground for rejection of the draw. *See First Arlington Nat'l Bank v. Stathis,* 90 Ill.App.3d 802, 46 Ill.Dec. 175, 183, 413 N.E.2d 1288, 1296 (1st Dist.1980) (objections to draw documents not made by issuing bank in initial correspondence with beneficiary concerning reasons for dishonor of draw on letter of credit were waived and would not be considered by court on appeal). However, by failing to raise the nonconformity as a reason for denying the March and December 1986 draws, Continental did not unequivocally intend to waive this ground should it ever appear in some *future* draw.

Indeed, there is no general obligation, absent specific circumstances to the contrary, for the drawee to provide an exhaustive list of all available grounds for rejection or be found to have waived them with respect to any subsequent draw attempt. Our conclusion might well be different as to the subsequent draw attempts at issue in this case if, after Continental had denied one of the earlier draws, Occidental had asked the bank to confirm all the nonconformities contained in that earlier draw so that Occidental (and Union) could submit an acceptable draw. If Occidental had taken such measures prior to submitting the March 1987 draw, we might conclude that Continental should be deemed to have waived any complaints about the earlier draw it failed to mention to Occidental. But Occidental did not take such measures here, and the facts of this case do not suggest that Occidental was in fact attempting to cure the defects in the March and December 1986 draws when it submitted the March 1987 draw. The basis for the March 1986 draw was the lack of an amendment extending the expiration date of the letters—a purpose wholly different from the March 1987 attempt, which was undertaken to compensate Occidental and the Liquidator for liabilities incurred under the Bill's Coal bonds. No cure was necessary after the rejection of the March 1986 draw because the letters had already been extended. Similarly, the February 1987 draw intervened between the December 1986 and the March 1987 draws. The February 1987 draw was hardly intended as a cure of the December 1986 draw because Occidental again in February 1987 made a unilateral attempt, which was Continental's stated reason for the rejection of the December 1986 draw. Under these circumstances, there is no adequate basis for applying the equitable doctrine of waiver in Occidental's favor.

Occidental claims in its opening brief that it relied to its detriment on Continental's silence with regard to the language nonconformity in the 1986 draws in preparing the March 1987 draw.[6] Occidental has

---

6. In its reply brief, however, Occidental contends for the first time that it need not show

reliance in order to prevail here because this is a letter of credit case. Appellant's Reply Br. at

failed to demonstrate actionable reliance on its previous unsuccessful draw attempts. In the first place, Occidental's February 1987 draw did not contain the language nonconformity at issue: thus, Occidental obviously did not rely consistently on Continental's previous silence on that point. More importantly, Foley—Occidental's attorney who drafted the documents for all four of Occidental's attempted draws—knew at the time he reviewed the March 1987 draw papers that strict conformity to the language of the letters was critical to a successful draw. The district court determined that Foley either "knowingly or recklessly" permitted the defective sight draft to be submitted, even though time to make a draw on the credit was rapidly running out. 725 F.Supp. at 386. Perhaps Foley's oversight was simply negligent: in any event, he cannot claim that he relied on Continental's silence regarding the nonconformity when he himself knew full well that strict conformity was essential. Under these circumstances, application of the doctrine of estoppel against Continental would be inequitable.

### IV. OCCIDENTAL'S CONSENT TO THE REDUCTION OF LETTER NO. 6328290

■ Occidental claims finally that it is entitled to collect the full value of the letters of credit because Continental's reduction in value of letter no. 6328290 without Occidental's consent constituted an anticipatory breach of contract. It is undisputed that Bill's Coal requested the reduction and that Union acceded to it.[7] As the district court correctly held, Occidental bore the burden of proof at trial of establishing anticipatory repudiation since repudiation is simply one form of breach of contract. 725 F.Supp. at 388 (citing *Perlman v. Time, Inc.*, 133 Ill.App.3d 348, 88 Ill.Dec. 524, 478 N.E.2d 1132, 1136 (1st

Dist.1985), and *Vandevier v. Mulay Plastics, Inc.*, 135 Ill.App.3d 787, 90 Ill.Dec. 558, 561, 482 N.E.2d 377, 380 (1st Dist. 1985)). The district court observed that the evidence regarding Occidental's consent was inconclusive. Cover X, Occidental's agents with respect to the Bill's Coal bonds, either denied having consented to the reduction or could not recall whether a request for reduction of the letter had been made. Cover X's collateral files were incomplete, but Continental's files contained a memorandum stating that Occidental had consented to the reduction. We are not so certain as the district court was that Occidental's consent to the reduction would have been "logical": even though Kansas had released one bond and even assuming that the letters were tied to particular bonds (which Occidental disputes), Occidental and Union were still heavily undersecured against the total value of the bonds issued.

But we agree with the district court that Occidental has failed to carry its burden of demonstrating anticipatory breach, both because of the conflicting evidence and because of Occidental's own conduct following its discovery of the reduction. The district court noted that Occidental knew about the reduction no later than March 1986, when it submitted an unsuccessful joint draw with the Liquidator. The certification pertaining to letter no. 6328290 shows that the face value of that letter was $733,000.00—the reduced amount. Joint App. tab 14. Occidental attempted three further draws on the letters, and in none of them did it claim the original value of no. 6328290 or complain about the reduction. Indeed, Occidental did not register a complaint with Continental about the reduction until December 1986. Occidental states that during the nine months between March and December 1986, it was conduct-

16 n. 7 (citing *Northern Trust Co. v. Oxford Speaker Co.*, 109 Ill.App.3d 433, 65 Ill.Dec. 113, 117, 440 N.E.2d 968, 972 (1st Dist.1982)). We are perplexed that Occidental should relegate what would seem to be a major component of its appeal on this ground to a footnote in its reply brief. In any event, we note that the *Oxford Speaker* decision accepts and applies, in the context of a dishonored letter of credit, the traditional requirement that the party claiming estoppel demonstrate her detrimental reliance

on the other party's conduct. 65 Ill.Dec. at 117, 440 N.E.2d at 972.

7. Occidental asserts for the first time in a footnote in its Reply Brief at 24 n. 10 that Continental failed to establish that Union had consented to the reduction of the value of no. 6328290. We will not consider this afterthought argument.

ing an internal investigation to determine whether any of its employees or agents had consented to the reduction. The Illinois UCC apparently follows the general rule that a party capable of making an otherwise conforming draw is not obligated to risk dishonor of a draw attempt in order to preserve her rights to challenge an anticipatory repudiation. Ill.Rev.Stat. ch. 26, § 5–115(2); *see also* J. Dolan, *The Law of Letters of Credit,* ¶ 9.02(2) (1984). Thus, once Occidental had incurred the requisite liability under the bonds, it need not have attempted a draw claiming the original value of letter no. 6328290. However, we find it puzzling that Occidental did not object to Continental about the reduction as soon as it was first noticed. The nine-month delay weakens Occidental's claim that it never consented to the amendment.

The only written evidence produced at trial on this issue was the memorandum from Ann Steck, a Continental employee in the Mining Division, to Marcus Jefferson, who worked in Continental's Letters of Credit Division. The memorandum was dated October 25, 1984, and stated:

> Please amend Standby Letter of Credit # 6328290 by reducing it by $281,000 from $1,014,000 to $733,000.
>
> You have already received the authorization from the beneficiary and the account party for this amendment.

If Continental bore the burden of proving that it had obtained the beneficiaries' consent, we doubt it could carry that burden based solely on this memorandum. However, it is Occidental that bears the burden of proving Continental's failure to obtain the necessary consent for the amendment. Given the flimsy evidence on both sides of the issue, we cannot disagree with the district court that Occidental has failed to carry its burden of proving anticipatory repudiation of the credit.

### V. CONCLUSION

The district court's judgment is
AFFIRMED.